18 So.2d 810

**ALABAMA STATE FEDERATION OF LA-
BOR et al. v. McADORY, County Solici-
tor, et al.**

6 Div. 234.

Supreme Court of Alabama.

May 25, 1944.

Rehearing Denied June 22, 1944.

Horace C. Wilkinson and Fred G. Koenig, both of Birmingham, for appellants.

5

8

Wm. N. McQueen, Acting Atty. Gen.,
Geo. C. Hawkins, Asst. Atty. Gen., and
David Satterwhite and Evans Dunn, both of
Birmingham, John E. Adams, of Grove
Hill, and John W. Lapsley, of Birmingham,
for appellees.

GARDNER, Chief Justice.

Plaintiffs, under the Declaratory Judgment Statute of this State (Title 7, §§ 156–168, Code of 1940), seek to test the constitutional validity of what is commonly referred to as the "Bradford Act," which concerns labor and labor organizations and passed by the Legislature in 1943. Acts 1943, p. 252, Code 1940, Tit. 26, § 376 et seq. All parties upon this appeal argue the case upon the assumption of the regularity of the proceeding in every respect, and the case will be so considered here.

The attack is upon the Act as a whole and upon several of its separate sections. The cause was, by consent, tried before a court of Jefferson County composed of three of its judges, including the presiding judge of that circuit. In the court below the ruling was that the Act as a whole was constitutional, and Section 7, here so vigorously assailed, was likewise held valid. Sections 12 and 17 were held void, and Sections 13 and 14 void in part, but that the validity of these particular features of the Act did not affect the validity of the Act as a whole. The court refrained from passing upon the constitutionality of Sections 15 and 16. But upon this appeal counsel for the respective parties have very ably argued all the questions presented as to each feature of the Act, and seek a conclusion of the whole matter. We acquiesce in this treatment of the appeal and proceed to decision of all questions raised.

At the outset reference may be made, as is often done, to the principles by which courts are guided when it is sought to strike down as violative of the constitution a legislative act. Uniformly, the courts recognize that this power is a delicate one, and to be used with great caution. It should be borne in mind, also, that legislative power is not derived either from the state or federal constitutions. These instruments are only limitations upon the power. Apart from limitations imposed by these fundamental charters of government, the power of the legislature has no bounds and is as plenary as that of the British Parliament. It follows that, in passing upon the constitutionality of a legislative act, the courts uniformly approach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government. All these principles are embraced in the simple statement that it is the recognized duty of the court to sustain the act unless it is clear beyond reasonable doubt that it is violative of the fundamental law. State ex rel. Wilkinson v. Murphy, 237 Ala. 332, 186 So. 487, 121 A.L.R. 283.

Another principle which is recognized with practical unanimity, and leading to the same end, is that the courts do not hold statutes invalid because they think there are elements therein which are violative of natural justice or in conflict with the court's notions of natural, social, or political rights of the citizen, not guaranteed by the constitution itself. Nor even if the courts think the act is harsh or in some degree unfair, and presents chances for abuse, or is of doubtful propriety. All of these questions of propriety, wisdom, necessity, utility, and expediency are held exclusively for the legislative bodies, and are matters with which the courts have no concern. This principle is embraced within the simple statement that the only question for the court to decide is one of power, not of ex-

pediency or wisdom. 11 Am.Jur. pp. 799–812; A. F. of L. v. Reilly, District Court of Colorado, 7 Labor Cases No. 61,761.

The broad doctrine as thus announced is sustained by the weight of authority, both in the Federal and the state courts. For our own State the cases of City of Ensley v. Simpson, 166 Ala. 366, 52 So. 61, and State v. Ala. Fuel & Iron Co., 188 Ala. 487, 66 So. 169, L.R.A.1915A, 185 Ann.Cas. 1916E, 752, furnish apt illustrations. And as for the Federal courts, reference may be made to Flint v. Stone Tracy Co., 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389, Ann. Cas.1912B, 1312.

▇ Likewise, another principle should be kept in mind, and that is: Where the validity of a statute is assailed and there are two possible interpretations, by one of which the statute would be unconstitutional and by the other would be valid, the courts should adopt the construction which would uphold it. 11 Am.Jur. p. 725. Or, as otherwise stated, it is the duty of the courts to adopt the construction of a statute to bring it into harmony with the constitution, if its language will permit. This principle has been often recognized by our own Court. State v. Birmingham So. Ry. Co., 182 Ala. 475, 62 So. 77, Ann.Cas.1915D, 436; Whaley v. State, 168 Ala. 152, 52 So. 941, 30 L.R.A.,N.S., 499; State ex rel. Collman v. Pitts, 160 Ala. 133, 49 So. 441, 135 Am.St. Rep. 79. It was well stated by the Supreme Court of the United States in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 621, 81 L.Ed. 893, 108 A.L.R. 1352, in the following language:

"The cardinal principle of statutory construction is to save and not to destroy. We have repeatedly held that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act. Even to avoid a serious doubt the rule is the same."

Bearing in mind these well-recognized principles, we proceed to a consideration of the constitutional questions here presented.

### The Act as a Whole.

▇ The first constitutional question presented relates to the Act as a whole. It is insisted that its passage violated Section 45 of our Constitution, which provides that every law should contain but one subject, which shall be clearly expressed in its title. This constitutional provision is mandatory upon the courts, and its purpose fully stated in the leading case of Ballentyne v. Wickersham, 75 Ala. 533. Numerous cases have dealt with this constitutional provision, with full discussion and varied illustrations.

▇ The particular objection here urged so strenuously is that the Act contains more than one subject. Of course, as has been often stated, the purpose of the requirement of a single subject is primarily to prevent "log-rolling" legislation, which would result in the support of doubtful measures induced by adding others upon unrelated subjects. It has been stated, also; that incidentally, the purpose was to avoid ill-considered provisions passing into law while the thought of the Legislature is directed to another subject.

▇ The title to the Act, like every instrument known to the law, is to be construed as a whole. Gibson v. State, 214 Ala. 38, 106 So. 231; Davidson v. Phelps, 214 Ala. 236, 107 So. 86; State ex rel. Ward v. Henry, 224 Ala. 224, 139 So. 278; Yeilding v. State ex rel. Wilkinson, 232 Ala. 292, 167 So. 580, 583. "A statute has but one subject, no matter how many different matters it relates to, if they are all cognate, and but different branches of the same subject." Yeilding v. State, supra. And in State v. Henry, supra [224 Ala. 224, 139 So. 281], speaking to this question the Court said:

"It is settled under our decisions that however numerous the subjects stated in the title, and however numerous the provisions in the body of the act may be, if they can be by fair intendment considered as falling within the subject-matter legislated upon in the act, or necessary as ends and means to the attainment of such subject, the act does not offend our constitutional provision that no law shall embrace more than one subject, which must be expressed in its title."

Counsel in argument ingeniously select different phases of the subject of the Act, insisting that each is separate and distinct. But we cannot agree. As we have previously noted, the title of the Act must be construed as a whole and considered in the light of the subject matter treated in the body of the Act. When so considered, we find in the passage of this Act no infringement of Section 45. The entire Act, as well as the title, indicates that the subject

matter concerns labor and the regulation of labor organizations. Clearly enough, the establishment of a Department of Labor and a provision for a Mediation Board come within the influence of this subject. So, likewise, as to the numerous regulations contained in the several provisions of the Act.

Counsel refer to some of the prohibitions embraced in the Act, which, it is urged, do not come within the meaning of the word "regulation"; citing to this effect Miller v. Jones, 80 Ala. 89. Like argument was advanced in Davidson v. Phelps, supra, where this Court observed, in answer to this insistence, that there are elements of prohibition or restriction inherent in all regulations. Numerous states have like constitutional provisions, among them the State of Illinois. Similar argument was advanced before the Supreme Court of Illinois in Fenske Bros. v. Upholsterers' International Union, 358 Ill. 239, 193 N.E. 112, 120, 97 A.L.R. 1318, concerning an act, the title of which was: "An Act relating to disputes concerning terms and conditions of employment." Smith-Hurd Stats. c. 48, § 2a. The body of the act prohibited injunctive relief in certain instances which, it was insisted, was in no wise indicated in the title. The Court replied:

"It is claimed that the title does not indicate anything as to injunctions or their prohibition or that it limits and restricts the jurisdiction of courts of equity, and that these subjects are not germane to the title. We have repeatedly held that, although numerous provisions in an act are not expressed in the general title, the purpose of the constitutional provision is fulfilled when the general subject indicated by the title reasonably covers the provisions of the act when they are related and have some connection, more or less direct, with the subject of the legislation. Unless the act contains matters having no relation to the title, the constitutional provision is not violated. The provisions of the statute as to injunctions are not inconsistent with, or foreign to, the general subject. The act therefore does not violate the constitutional provisions requiring all acts to contain but one subject, which shall be expressed in the title."

But we forego further discussion. Upon careful consideration of argument of counsel for plaintiffs, including a reconsideration of many of the authorities cited (among them, State v. So. Ry. Co., 115 Ala. 250,

22 So. 589; White v. Burgin, 113 Ala. 170, 21 So. 832; Woolf v. Taylor, 98 Ala. 254, 13 So. 688; Board of Revenue and Road Com'rs of Mobile County v. State, 200 Ala. 456, 76 So. 388; Fidelity & Deposit Co. v. Farmers' Hardware Co., 223 Ala. 477, 136 So. 824; State ex rel. Bassett v. Nelson, 210 Ala. 663, 98 So. 715; Houston County Board of Revenue v. Poyner, 236 Ala. 384, 182 So. 455), we are unable to concur in the view that this Act in any manner violates the provisions of Section 45 of our Constitution.

 The Act as a whole is further attacked upon the theory that it is repugnant to the National Labor Relations Act, 29 U.S.C.A. §§ 151–166. But we think this question was fully answered by the Wisconsin Court in Allen-Bradley Local No. 1111 v. Wisconsin Employment Relations Board, 237 Wis. 164, 295 N.W. 791. See also full discussion of the subject in Wisconsin Labor Relations Board v. Fred Rueping Leather Co., 228 Wis., 473, 279 N.W. 673, 117 A.L.R. 398. On review of the opinion in the Allen-Bradley case by the Supreme Court of the United States the ruling of the Wisconsin Court, to the effect there was no such repugnancy between the state act and that passed by Congress, was fully sustained. Allen-Bradley Local v. Wisconsin Employment Relations Board, 315 U.S. 740, 62 S.Ct. 820, 826, 86 L.Ed. 1154. The Court in unanimous opinion pointed to the well-recognized rule that an intention of Congress to exclude states from exerting their police power must be clearly manifested, and that the courts will not lightly infer that Congress, by the mere passage of a federal act, has impaired the traditional sovereignty of the several states in that regard. The Court concluded by saying: "In sum, we cannot say that the mere enactment of the National Labor Relations Act without more excluded state regulation of the type which Wisconsin has exercised in this case." We consider the ruling in that case ample authority in answer to the contention here made.

 Argument is advanced also that the Act is invalid because of a capricious discrimination, in that it expressly excludes organizations coming within the influence of the Act of Congress known as the Railway Labor Act, as amended, 45 U.S.C.A. §§ 151–188. But a study of that Act, to which we gave attention in Steele v. L. & N. R. Co., 16 So.2d 416, will disclose that it was the intent of Congress, in large part

if not entirely, to pre-empt the field covered by the salient features of the statute.

■ And in addition to this, the authorities very generally recognize that as to the matter of classification, much is left to sound legislative discretion. As said by the Supreme Court of the United States in National Labor Relations Board v. Jones & Laughlin, 301 U.S. 1, 57 S.Ct. 615, 628, 81 L.Ed. 893, 108 A.L.R. 1352, legislative authority exerted within its proper field need not embrace all the evils within its reach. To use the language of that opinion: "The Constitution does not forbid 'cautious advance, step by step,' in dealing with the evils which are exhibited in activities within the range of legislative power."

■ Like thought was also expressed in People of State of New York ex rel. Bryant v. Zimmerman, 278 U.S. 63, 49 S. Ct. 61, 73 L.Ed. 184, 62 A.L.R. 785, where the Court observed that the legislature was not bound to extend regulations to all cases which it might possibly reach; that dealing with practical exigencies, the legislature may be guided by experience. True, as there pointed out, such a classification by the lawmaking body must not be purely arbitrary, oppressive or capricious, but the mere production of inequality is not enough. The inequality produced in order to encounter the challenge of the Constitution must be actually and palpably unreasonable and arbitrary.

Certainly, the full scope of the National Railway Labor Act suffices to demonstrate that the exclusion of organizations concerning that particular field was not an arbitrary or unfounded discrimination. The two authorities cited should, we think, likewise suffice to answer this contention.

■ We are thus brought to a consideration of the several sections of the Act here under attack. The validity of the Act and its several provisions rests upon the question of whether or not the State, through its lawmaking body, was within the proper exercise of its police power.

As we have often observed, the exercise of this power is a governmental function, and is of such a character that it cannot be alienated or surrendered by the legislature. The limits of a state's police power have never been fixed nor its boundaries defined. This for the reason that it is not subject to any definite limitations or boundaries, for it represents the state's great reserve power, and at all times is co-extensive with the necessity of the case and the safeguard of public interest. It is a power inherent in the government, and while it may be set aside by the Constitution, yet in order to find that it has been so set aside, the Constitution must plainly so indicate. And the authorities agree it is a peculiar function of the law-makers to determine when the welfare of the people requires the exercise of the state's police power and what are appropriate measures to that end, subject only to the power of the courts to judge whether any particular law is an invasion of rights secured by the Constitution. State v. Murphy, 237 Ala. 332, 186 So. 487, 121 A.L.R. 283; Franklin v. State, 232 Ala. 637, 169 So. 295; Leary v. Adams, 226 Ala. 472, 147 So. 391; State v. Polakow's Realty Experts, 243 Ala. 441, 10 So.2d 461.

And in Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 510, 78 L.Ed. 940, 89 A.L.R. 1469, reference was made to the inevitable collision between the right of the citizen to exercise exclusive dominion over his property and freely to contract about his affairs, and that of the state to regulate the use of property in the conduct of business. The Court observed:

"No exercise of the private right can be imagined which will not in some respect, however slight, affect the public; no exercise of the legislative prerogative to regulate the conduct of the citizen which will not to some extent abridge his liberty or affect his property. But subject only to constitutional restraint the private right must yield to the public need.

"The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained.

"It results that a regulation valid for one sort of business, or in given circumstances, may be invalid for another sort, or for the same business under other circumstances, because the reasonableness of each regulation depends upon the relevant facts."

The opinion contains many illustrations where private rights must yield to the

public good in obedience to the mandate of the lawmaking power.

There are, of course, limitations to the police power, though they have never been drawn with any degree of exactness. As observed in 11 Am.Jur. p. 975, it is much easier to recognize the existence and sources of this power than to mark its boundaries or prescribe limitations to its exercise. As observed by Mr. Justice Holmes in Noble State Bank v. Haskell, 219 U.S. 104, 31 S.Ct. 186, 188, 55 L.Ed. 112, 32 L.R.A.,N.S., 1062, Ann.Cas.1912A, 487, concerning the police power: "Lines are pricked out by the gradual approach and contact of decisions on the opposing sides." As we observed in State v. Murphy, supra [237 Ala. 332, 186 So. 496, 121 A.L.R. 283]: "Government takes account of the measured step of progress for the application of the police powers to meet new public needs," and instances were noted indicating that what, in other days would not have found favor or countenance with either law-makers or courts as appropriate or proper manifestations of the police power, is now never questioned or doubted.

■ The police power is said to extend in a general way to all great public needs. 11 Am.Jur. p. 978. Each state has the power to regulate the relative rights and duties of all persons, individuals, and corporations within its jurisdiction for the public convenience and the public good, the only limitation being that such regulations shall not prove repugnant to the provisions of the state or national Constitution. 11 Am.Jur. p. 987.

■ We should stress, also, the fact that a police regulation not operating unreasonably beyond the occasion of its enactment, is not rendered invalid by the fact that it may affect incidentally the exercise of some right guaranteed by the constitution. But the police power may not unreasonably invade private rights guaranteed under the federal or state constitution. And, as we observed in State v. Polakow's Realty Experts, supra, all regulations involve in some degree a limitation upon the exercise of the right regulated. The test is whether the limitation imposed is really by way of regulation only and is one whose purpose and effect go no further than throw reasonable safeguards in the public interest around the exercise of the right. If the limitation is of this character, its imposition is a proper exercise of the police power resident in the legislature and whose exercise is one of the latter's most important functions.

■ As we have observed, this power must not be exercised arbitrarily or capriciously, and there must be some reasonable relation to the regulation and the ends to be attained. But if upon the matter men may reasonably differ, in view of all the circumstances, the legislative act in the exercise of the police power must be sustained. Leary v. Adams, supra. The cases recognize the rule that the lawmaking authorities may not, under the guise of police power, impose restrictions that are unnecessary and unreasonable upon the use of private property or the pursuit of useful activities. The restriction imposed must bear some substantial relation to the public need or general welfare.

■ In Euclid, Ohio, v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016, to which we made reference in Leary v. Adams, supra, concerning a zoning ordinance, the Court made the observation that, while the meaning of constitutional guaranties never varies, yet the scope of their application must expand or contract to meet new or different conditions constantly coming within the field of their operation. In a changing world it is impossible that it should be otherwise.

Speaking also to a zoning ordinance, the United States Supreme Court in Zahn v. Board of Public Works, 274 U.S. 325, 47 S.Ct. 594, 595, 71 L.Ed. 1074 (also noted in the Leary case, supra), the Court observed in regard to the passage of such zoning ordinance, as follows:

"The most that can be said is that whether that determination was an unreasonable, arbitrary, or unequal exercise of power is fairly debatable. In such circumstances, the settled rule of this court is that it will not substitute its judgment for that of the legislative body charged with the primary duty and responsibility of determining the question."

In Labor Board v. Jones & Laughlin, supra, the Court was dealing with an act of Congress subjecting the employer to many restraints in regard to his relationship with his employee. The act was vigorously criticized as being one-sided in its application; that it subjects the employer to supervision and restraints and

14

leaves untouched the abuses for which employees may be responsible. The Court, in answering the argument, observed that it was dealing with the power of Congress, not with the particular policy or with the extent to which the policy should go, saying:

"We have frequently said that legislative authority, exerted within its proper field, need not embrace all evils within its reach. The Constitution does not forbid 'cautious advance, step by step,' in dealing with the evils which are exhibited in activities within the range of legislative power."

And we may observe, additional restrictions upon the rights of the employer are to be found in the Fair Labor Standards Act of Congress, recently considered and enforced by this Court in the case of Cudahy Packing Co. v. Bazanos, 15 So.2d 720.[1] A more recent illustration, from the United States Supreme Court, is to be found in Medo Photo·Supply Corp. v. National Labor Relations Board, 64 S.Ct. 830, decided April 10, 1944.

With these general observations we may now proceed with their application to the several sections of the Act here assailed.

 We may note at the outset that no one giving study to the historical background of the laboring man in his struggle to better his condition in life can for one moment doubt the wisdom and, indeed, the necessity, for organization. Some of these early struggles may be found noted in 31 Am.Jur. p. 836, but need no elaboration here. As observed in Vol. I, Teller's Labor Disputes and Collective Bargaining, Sec. 64, the right to form and join labor unions is but the expression of the employee's right to a free and open market, a recognized substantive right.

In Labor Board v. Jones & Laughlin, supra, the Court, after observing that the statute there in question went no further than to safeguard the right of employees to self-organize and to select representatives of their own choosing for collective bargaining or other mutual protection without restraints or coercion by their employer, said:

"That is a fundamental right. Employees have as clear a right to organize and select their representatives for lawful purposes as the respondent has to organize its business and select its own officers and agents. Discrimination and coercion to

prevent the free exercise of the right of employees to self-organization and representation is a proper subject for condemnation by competent legislative authority. Long ago we stated the reason for labor organizations. We said that they were organized out of the necessities of the situation; that a single employee was helpless in dealing with an employer; that he was dependent ordinarily on his daily wage for the maintenance of himself and family; that, if the employer refused to pay him the wages that he thought fair, he was nevertheless unable to leave the employ and resist arbitrary and unfair treatment; that union was essential to give laborers opportunity to deal on an equality with their employer."

We find ourselves in accord with the courts generally that the right of organization is a fundamental one. 31 Am.Jur. p. 851. See also Pittman v. Nix, Fla., 11 So.2d 791, 144 A.L.R. 1341.

 And we think it is well-settled that the members of a labor organization—that is, workmen who are not bound by contract for a definite period and have not, by agreement freely made, given up such rights—may, without liability, abandon their employment at any time, either singly or in a body, as a means of compelling or attempting to compel, their employers to accede to demands for better terms and conditions. As the Massachusetts Court observed in Pickett v. Walsh, 192 Mass. 572, 78 N.E. 753, 6 L.R.A.,N.S., 1067, ·116 Am.St.Rep. 272, 7 Ann.Cas. 638, laborers, in the exercise of the common-law rights of citizens to pursue their callings as in their judgment they see fit, have a right to organize unions and to utilize such organizations by instituting a strike. See also Bossert v. Dhuy, 221 N.Y. 342, 117 N.E. 582, Ann.Cas.1918D, 661. Numerous authorities are found cited in 31 Am. Jur. p. 929.

In Hardie-Tynes Manufacturing Co. v. Cruise, 189 Ala. 66, 66 So. 657, 660, these inherent rights to which we have referred; that is, the right of the working man to organize for his own protection and betterment and the right to strike, were recognized, wherein the Court, speaking of the authorities upon the subject, said:

"They seem to be unanimous, also, in holding that employes may rightfully organize themselves into associations for mutual protection and betterment; and

---

[1] 245 Ala. 73.

that, having thus organized, they may by confederated action withdraw from, or decline to enter, the service of any particular employer."

But our country has grown in population and in industrial importance, and with this growth labor organizations have kept apace. Their power and influence are fully felt and well understood, as well as many conflicts between labor and management in all forms of industry.

As said in Carpenters' & Joiners' Union v. Ritter's Cafe, 315 U.S. 722, 62 S.Ct. 807, 808, 86 L.Ed. 1143:

"The economic contest between employer and employee has never concerned merely the immediate disputants. The clash of such conflicting interests inevitably implicates the well-being of the community. Society has therefore been compelled to throw its weight into the contest. The law has undertaken to balance the effort of the employer to carry on his business free from the interference of others against the effort of labor to further its economic self-interest. And every intervention of government in this struggle has in some respect abridged the freedom of action of one or the other or both. * * *

"The right of the state to determine whether the common interest is best served by imposing some restrictions upon the use of weapons for inflicting economic injury in the struggle of conflicting industrial forces has not previously been doubted. * * *

"But the circumstance that a labor dispute is the occasion of exercising freedom of expression does not give that freedom any greater constitutional sanction or render it completely inviolable. * * * We must be mindful that 'the rights of employers and employees to conduct their economic affairs and to compete with others for a share in the products of industry are subject to modification or qualification in the interests of the society in which they exist. This is but an instance of the power of the State to set the limits of permissible contest open to industrial combatants.' "

In some of the states statutes have been passed modeled after the National Labor Relations Act, and providing a complete supervision of labor relations for employers in intrastate enterprises. Illustrative is the Colorado Act of 1943. Session Laws of Colorado 1943, c. 131, p. 392–418. Somewhat similar is the Wisconsin Act (Chapter 57, Laws of 1939), treated in Christoffel v. Wisconsin Employment Relations Board, 243 Wis. 332, 10 N.W.2d 197; and Hotel, etc., Alliance v. Wisconsin Employment Relations Board, 236 Wis. 329, 294 N.W. 632, 295 N.W. 634. This latter case was in part reviewed by the Supreme Court of the United States in Hotel, etc., Alliance v. Wisconsin Employment Relations Board, 315 U.S. 437, 62 S.Ct. 706, 86 L.Ed. 946, and as thus reviewed was affirmed.

The power of a state to pass such regulatory measures is based upon the police power, and this has been generally recognized. In the very recent case of Ex parte R. J. Thomas, 174 S.W.2d 958, 960, the Texas Supreme Court observed: "The right of the State under its inherent police power to regulate labor unions in order to protect the public welfare appears to be almost beyond question."

The Colorado Act was reviewed in A.F. of L. v. Reilly, 7 Labor Cases 61,761, supra. And in Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 744, 84 L.Ed. 1093, the Court observed: "The merest glance at State and Federal legislation on the subject demonstrates the force of the argument that labor relations are not matters of mere local or private concern."

Indeed, as we read the briefs, counsel for plaintiffs with commendable candor concede that the subject is one which may be embraced within the exercise of the police power of the State. The argument, as we understand it, is that the various provisions of this Act to which they have raised objections, do not constitute reasonable regulations, are unreasonable, arbitrary and capricious, or violative of fundamental rights secured under both the State and Federal Constitutions.

### Section 7.

This brings us to a consideration of the objections to Section 7 of the Act, first treated by counsel in brief. This provision of the Act requires that every labor organization functioning in Alabama, or hereafter desiring to function in Alabama, shall, before doing so, file a copy of its constitution and by-laws, and a copy of the constitution and by-laws of the national or international union, if any, to which such organization belongs, with the Department of Labor, omitting, however, any ritual relating solely to the initiation or reception of members. Amendments to such constitutions and by-laws are likewise

required to be filed with the Department of Labor. All such organizations functioning in this State and having 25 or more members in any calendar year shall, on a fixed date each year, file with every member of their respective labor organizations and with the Director of the Department of Labor, a report in writing showing the following facts, as of the close of business on the 31st day of December next preceding the date of filing:

· (1) The name of the labor organization; ·(2) the location of its principal office in Alabama; (3) the name of the president, secretary, treasurer, and other officers and business agent, together with their salaries, wages, bonuses, and other remuneration paid each, and the post office. address of each; (4) the date of regular election of officers; (5) the number of its paid-up members; (6) complete financial statement of all fees, dues, fines, or assessments levied or received, together with an itemized list of all disbursements, the name of recipients and the purpose therefor, covering the preceding twelve months; (7) a complete statement of all property owned by the organization, including monies on hand or credited to the organization.

The Director of Labor shall have printed and make available public forms for the making of such report, and at the time of the filing of such report, it shall be the duty of the organization to pay the Director of Labor an annual fee therefor in the sum of $2.00. The Director is to file and index the reports, and the section provides that the records provided for shall be made available by the Director of Labor in his office to the Governor of Alabama for examination. It is made unlawful for any fiscal or other officer or agent of any labor organization to collect or accept payment of any dues, fees, assessments, fines, or any other monies from any member while such labor organization is in default with respect to filing the annual report required by this section.

In Section 18 of the Act the violation by any labor organization of any of its provisions subjects them to a civil penalty of a sum not exceeding $1000 for each such violation. And by the same section the violation of the provisions of Section 7, as to the officers or agents collecting dues and other monies while such organization is in default with respect to filing the annual report, is declared to be a misdemeanor and punishable by a fine of not exceeding $500 or by imprisonment at hard labor for not exceeding twelve months, or both.

In arguing against the validity of this section counsel lay much stress upon the constitutional right of free speech and of assembly, and we are cited, among other authorities, to De Jonge v. Oregon, 299 U. S. 353, 57 S.Ct. 255, 81 L.Ed. 278, where the Court observed that the right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental. And counsel would argue that, because it is a part of the purpose of labor organizations to peaceably assemble and discuss their affairs, the State has no right of regulation of the character here in question because of the fact these fundamental rights are involved and the restraints of Section 7 are violative thereof. And in reply brief the argument is further advanced that these provisions must be held unreasonable and invalid if in fact there is any restraint to the liberty of speech involved. We are cited to both the Alabama and Federal Constitutions guaranteeing the freedom of assembly and speech, Const.U.S.Amend. 1, Const.Ala. § 4, and to Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192; Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L. Ed. 1292, 146 A.L.R. 81; and other authorities of like nature.

Counsel do not contend that labor organizations are immune from regulation, but assert the contrary. They say, however, regulation is one thing, but restraint of liberty of speech another. But we think this argument overlooks the full power of the Legislature in the exercise of the police power of the State, and it overlooks also the full meaning of the word "functioning," as employed in Section 7. As defined in the Act, a labor organization is one which has within its membership employees working in the State of Alabama, organized for the purpose of dealing with employer or employers concerning the hours of employment, rates of pay, or the tenure or other terms and conditions of employment. And the courts, of course, take judicial knowledge of the fact—and the Act so discloses—that there are assessments and fines and dues, monies collected and disbursed, officers elected, and agents employed. Such organizations may sue and be sued and its properties subjected to the satisfaction of any judgment rendered against it. Title 7, Secs. 142–145, Code of 1940. The purpose and scope of the activities of labor organizations is fully discussed in United Mine

Workers of America v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762. And indeed, these are matters with which the courts are now entirely familiar.

"Function," as used in this Act, simply means a labor organization, whether incorporated or not, engaged in business in this State, and in the character of business thus indicated, for the promotion of the interests of its members. True, as a part of its functioning, and a part only, the assemblage of its members for discussion is had, but this is merely incidental. As the authorities cited indicate, every enactment for public need necessarily results in some restraint of individual liberty.

But as observed by this Court in Carter v. Knapp Motor Co., 243 Ala. 600, 11 So.2d 383, 144 A.L.R. 1177, reiterated in Lash v. State, 244 Ala. 48, 14 So.2d 229, taking the language from the Supreme Court of the United States in Jones v. City of Opelika, 316 U.S. 584, 62 S.Ct. 1231, 86 L.Ed. 1691, 141 A.L.R. 514, and Carpenters' & Joiners' Union v. Ritter's Cafe, 315 U.S. 722, 62 S.Ct. 807, 86 L.Ed. 1143:

" 'Courts are competent to adjudge the acts men do under color of a constitutional right, such as that of freedom of speech * * * and to determine whether the claimed right is limited by other recognized powers equally precious to mankind.' * * * 'Whenever state action is challenged as a denial of "liberty", the question always is whether the state has violated the "essential attributes of that liberty." ' " [243 Ala. 600, 11 So.2d 386, 144 A.L.R. 1177.]

Numerous instances might be cited to indicate where private rights must yield to public need. The establishment of the Securities Commission of this State is one example; and the requirement of a certificate to conduct the business of real estate brokers, treated in State v. Polakow's Real Estate Experts, supra, is another.

As observed by the Supreme Court of Texas in Ex parte R. J. Thomas, supra, the state, under its police power, may enact laws which interfere indirectly and to a limited extent with the right of speech or the liberty of the people where they are reasonably necessary for the protection of the general public. And as observed in Carpenters' & Joiners' Union v. Ritter's Cafe, supra:

"Where, as here, claims on behalf of free speech are met with claims on behalf of the authority of the state to impose reasonable regulations for the protection of the community as a whole, the duty of this Court is plain. Whenever state action is challenged as a denial of 'liberty', the question always is whether the state has violated 'the essential attributes of that liberty'. * * * While the right of free speech is embodied in the liberty safeguarded by the Due Process Clause, that Clause postulates the authority of the states to translate into law local policies 'to promote the health, safety, morals and general welfare of its people * * *. The limits of this sovereign power must always be determined with appropriate regard to the particular subject of its exercise.' "

The argument advanced here was also advanced and answered by the Colorado Court in A. F. of L. v. Reilly, supra, and to like effect. See also Christoffel v. W. E. R. B., supra. And in Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095, it was pointed out that the freedom of speech guaranteed by the Constitution is not such an absolute right as to deprive legislative bodies of their proper exercise of the police power of the state.

If we follow the argument of counsel for plaintiff to its ultimate conclusion, it is difficult to see where any effective legislation could be had concerning regulations of organizations of this character. We think the authorities which we have herein cited clearly demonstrate that they are subject to the police power of the state, and that the contention as to the violation of the constitutional provisions of free speech and assembly invalidates any of the provisions of the Act, is untenable.

The argument is further advanced that the Act requires the issuance of a license to a labor organization as a condition precedent to functioning in the State; and much stress is laid upon International Text-Book Co. v. Pigg, 217 U.S. 91, 30 S. Ct. 481, 486, 54 L.Ed. 678, 27 L.R.A.,N.S., 493, 18 Ann.Cas. 1103. That authority rested solely upon the right of a state to regulate interstate commerce. The opinion concludes with the statement: "The state cannot thus burden interstate commerce." It is, in our opinion, inapplicable here. In the first place, there is no license required. The fee of $2.00 is merely a regulatory and incidental matter, to be collected for the purpose of defraying the expense incidental to the furnishing of the forms and reports, and to the filing thereof with the Director.

The question resolves itself after all as to whether or not the filing of these reports can be held to be a reasonable regulation under the police power of the State. The Director of Labor has construed the Act to the effect that these reports are not for public consumption. We think a reading of the Act clearly indicates that they are to be exhibited to the Governor only, and the Director is justified in this interpretation of the Act. Clearly enough, if we are to have a Department of Labor to deal with labor organizations, and to attempt to settle disputes, and to bring about industrial peace in this State, it is a reasonable regulation that the Director be informed of the character of the organization, its varying rules and regulations.

The constitution, rules, and by-laws of a labor organization are the source of its authority. They constitute not only the contract between the labor union and the members, but also the contract between the members and other members of the union. As said in Vol. I, Sec. 62, Teller on Labor Disputes and Collective Bargaining: "Questions relating to the property, funds, and internal administration of labor unions raise no problem peculiar. to such unions." And in the succeeding section of this work the author cites instances in which it became necessary to carefully examine into the source of the particular organization involved, so as to determine whether or not it was in fact a labor union or merely an organization seeking, for its own advantage, to assume the cloak of such a union.

A rather extreme example of the constitutional validity of requirements of this character is to be found in the statute of New York, which required a copy of the constitution, by-laws, rules, regulations, oath of membership and the roster of its membership, of a secret organization, to be filed with the Secretary of State, with exemption of numerous other secret organizations from the influence of the act. Upon the question of classification, the Court observed, among other things, that a lack of abstract symmetry does not matter and that the state may classify with reference to the evil to be prevented. The holding was that the requirements were valid, and the inequality produced was not actually and palpably unreasonable and arbitrary. See People of the State of New York v. Zimmerman, 278 U.S. 63, 49 S.Ct.

61, 73 L.Ed. 184, 62 A.L.R. 785, affirming the New York Court of Appeals in People v. Zimmerman, 241 N.Y. 405, 150 N.E. 497, 43 A.L.R. 909.

And as to the requirement for a financial statement we think it clear enough these provisions may be fully justified as a regulation for the benefit of the members of the organization. The Texas Court in Ex parte R. J. Thomas, Tex.Sup., 174 S.W.2d 958, 960, referred to the large membership in labor unions and the large sums of money contributed in the form of dues and the manner in which these unions function for the protection of their members, all of which greatly affect the economic life of the individual worker. The opinion proceeds:

"The large membership in a single union, and the limited opportunity of the individual member to personally familiarize himself with the manner in which his union is operated make it impossible for the individual worker to protect himself in his own right against its mismanagement. These circumstances present a field for legislation by the State for the protection of the rights of the laborer as well as the general public."

Nor can we agree that any claimed right of privacy in any manner affects the validity of Section 7. It has in it no elements of a "fishing expedition" as spoken of in Federal Trade Comm. v. American Tobacco Co., 264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696, 32 A.L.R. 786, or in Jones v. Securities & Exchange Comm., 298 U.S. 1, 56 S.Ct. 654, 80 L.Ed. 1015. And, indeed, under the proper interpretation of the Act, as given by the Director of Labor, these reports, as we have above indicated, are not for public consumption. But even beyond all this, any such claimed right of privacy is subject (as disclosed by an examination of numerous authorities cited in 11 Am.Jur. p. 1135 et seq.) to such restraints as are necessary to the common welfare.

The provisions of Section 7 have the appearance of having largely been taken from Section 5 of the Labor Relations Act of the State of Kansas, Laws 1943, c. 191, as found reported in 2A Labor Law Service No. 41,033. The Kansas Act, however, in Section 6 goes one step further and makes specific provision to the effect that the records filed with the Secretary of State shall be available to all persons.

We do not find where the provisions of this Kansas Act have been tested in the courts. It is given comment by the author in an article to be found in the January, 1944, issue of the Iowa Law Review, with particular reference to the requirement of financial statements, which the author insists is to be sustained, both upon the ground of protection of the members of the labor organization and upon the further ground that the financial affairs of unions, particularly economically powerful unions are matters of public concern.

■ But the Legislature has seen fit to make these requirements, and we are not able to say that they are arbitrary or capricious. The most that could be said for plaintiffs is that the question is a debatable one, and as we have pointed out, when such is the case, it is the duty of the court to sustain the legislative act.

■ We have already answered in the negative the contention that the Act conflicts with the National Labor Relations Act, and, as we have said, it imposes no burden on interstate commerce. We have also stated our view that no license is here required, and that the two dollar fee provided for in this section is but an incidental charge. Likewise, we have adverted to the case of International Text-Book Co. v. Pigg, supra, as indicating its inapplicability to the instant case. After all, and reduced to its last analysis, the question is whether or not the Legislature, in the provisions of Section 7, overstepped the bounds of police power of the State. If it be conceded there is debatable ground—and we think that is clear—it is our duty to declare in favor of the validity of this section. Such is our conclusion.

■ We may add the record discloses a number of labor unions (192) promptly complied with the provisions of Section 7. And it also may be noted that Congress in Section 117 of the Revenue Act of 1943, 26 U.S.C.A.Int.Rev.Code, § 54(f), inserted a provision requiring labor organizations, though exempt from income tax, to file an annual report with the Commissioner of Internal Revenue disclosing "the items of gross income, receipts, and disbursements, and such other information for the purpose of carrying out the provisions of this chapter as the Commissioner, with the approval of the Secretary, may by regulations prescribe." And though not here binding, it is proper also to direct attention to the fact that the three judge ruling of the court below in the instant case, declaring Section 7 valid, was likewise the ruling of the three judge federal court in the case of Borden v. Sparks et al., D.C., 54 F.Supp. 300, decided February 10, 1944. These rulings are due consideration in weighing the reasonableness of the regulations and as to whether or not a debatable question as to the exercise of the police power was presented.

## Section 12.

The next question involved concerns the validity of that part of Section 12 of this Act making it unlawful "in and about the business of an employer, for any employee to refuse to handle, install, use or work on any particular materials, equipment or supplies because not produced, processed or delivered by members of a labor organization."

■ It seems to be established by the decided weight of authority (Coppage v. Kansas, 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441, L.R.A.1915C, 960; Parkinson Co. v. Bldg. Trades Council, 154 Cal. 581, 98 P. 1027, 21 L.R.A.,N.S., 550; Cohn & Roth Elec. Co. v. Bricklayers' etc., Local, 92 Conn. 161, 101 A. 659, 6 A.L.R. 887; Bossert v. Dhuy, 221 N.Y. 342, 117 N.E. 582, Ann.Cas.1918D, 661 that a rule of a labor union forbidding its members to work with non-union men or members of a rival organization is valid. And likewise as to a rule of a labor organization refusing to allow members to work with non-union material. Paine Lumber Co. v. Neal, 244 U.S. 459, 37 S.Ct. 718, 61 L.Ed. 1256; State v. Van Pelt, 136 N.C. 633, 49 S.E. 177, 68 L.R.A. 760, 1 Ann.Cas. 495; Auburn Draying Co. v. Wardell, 227 N.Y. 1, 124 N.E. 97, 6 A.L.R. 901; annotations, 6 A.L.R. p. 958, 116 A.L.R. 513, 52 A.L.R. 1145, and 54 A.L.R. 806. See also to like effect, 63 C. J. p. 655; Restatement of the Law of Torts, §§ 802 et seq.

Though these cases may not have involved legislative acts, yet the principles that they recognize must be taken into consideration in determining the validity of this particular section. Counsel for defendants lay some stress upon A. F. of L. v. Reilly, the Colorado case cited above, defining a secondary boycott. But there is little similarity between the Colorado statute and Section 12 of the Bradford Act. The Court there was dealing with Section 2(11) of the Colorado statute, supra, Laws

1943, c. 131, defining secondary boycott. That provision of the Colorado Act here pertinent reads as follows:

"The term 'secondary boycott' shall include causing or threatening to cause, and combining or conspiring to cause or threaten to cause, injury to one not a party to the particular labor dispute, to aid which such boycott is initiated or continued, whether by (a) withholding patronage, labor or other beneficial business intercourse; (b) picketing; (c) refusing to handle, install, use or work on particular materials, equipment or supplies, or (d) by any other unlawful means, in order to bring him against his will into a concerted plan to coerce or inflict damage upon another or to compel the party with whom such labor dispute exists to comply with any particular demands."

It is this provision which was upheld by the Colorado Court.

Section 12, however, makes it a crime—a misdemeanor—with permissible heavy penalty, for a single workman to refuse to handle any material because not produced, processed, or delivered by members of a labor organization. The question of boycotts is fully treated in 31 Am.Jur. p. 955 et seq., and in an extensive note to Auburn Draying Co. v. Wardell, 227 N.Y. 1, 124 N.E. 97, 6 A.L.R. 901. Many of these authorities have been by us given consideration, but not in any of them do we find a provision of this drastic nature. Indeed, as we read the authorities, the provisions of Section 12 do not establish a secondary boycott as defined in any of the cited cases. See Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196. In the Wardell case, the New York Court makes reference to the individual freedom one may exercise, though indirectly it may affect another, saying [227 N.Y. 1, 124 N.E. 100]:

"The individual may do and does many acts which in their effect are or may be coercive as to another. The right to do those acts inheres in the natural freedom and the civil rights which are his."

We have shown that the authorities recognize that the workman has a right to refuse to work with non-union material. Yet under this section he would be compelled to work, or else be guilty of a criminal offense. Of course, every man may engage to work for or deal with, or refuse to work for or deal with, any man or class of men as he sees fit—whatever his motive or the resulting injury—without being held in any way accountable therefor. 31 Am.Jur. p. 842. Some of the authorities have said that members of labor unions consider the material processed or delivered by non-union workers threatens the interest of the union, and that in refusing to work on such material the union is only refusing to aid in its own destruction. 31 Am.Jur. p. 942.

This Section 12 makes no reference to a conspiracy or to the confederated action of two or more persons. Nor does it have reference to any intention of injury to another. The individual workman may be acting in entire good faith and in obedience to a rule of his local union, or he may be acting in entire good faith in what he considers to the best interests of the union to which he belongs, and to labor unions in general. His conduct may be in the nature of an individual protest against the use by his employer of material not processed by members of a labor union. But all of this is entirely lawful. He is acting within his rights, but without coercion and without confederation, and without malicious intent.

The authorities are to the effect that a labor union may, so long as its action is not directed against a particular individual, refuse to permit its members to work on material produced or transported by non-union labor, and that a strike called to compel the handling of union material only is not unlawful. 31 Am.Jur. p. 942. Of course, the refusal of the individual worker may culminate in a labor dispute, but if so, his action would be entirely lawful. The effect would be, as is well argued, to make it a crime under such circumstances to engage in a labor dispute concerning work with non-union material. A workman, even though acting in a proper manner, and refusing to work on non-union material but offering to submit the matter to a board of mediation, would yet be guilty of an offense.

It is to be noted that this section does not deal with the right to strike for non-union material. It deals solely with individual protest of the individual workman. We are inclined to the view that it is simply a refusal to perform a contract for personal service, which is under this section made a crime, and that it infringes closely upon the Thirteenth Amendment to the Federal Constitution prohibiting involuntary servitude of any character. As

said in Bailey v. State, 219 U.S. 219, 31 S.Ct. 145, 153, 55 L.Ed. 191: "There is no more important concern than to safeguard the freedom of labor upon which alone can enduring prosperity be based." In the same case the Court also observed:

"In this class of cases where the entire subject-matter of the legislation is otherwise within state control, the question has been whether the prescribed rule of evidence interferes with the guaranteed equality before the law, or violate those fundamental rights and immutable principles of justice which are embraced within the conception of due process of law."

And we may note the very recent case of the United States Supreme Court, re-affirming the Bailey case and others of like character, in Pollack v. Williams, 64 S.Ct. 792, decided April 10, 1944. It is suggested that Section 12, in its effect, merely outlaws a "sit-down" strike, condemned by the statutes of several states (Vol. I, Sec. 106, Teller on Labor Disputes and Collective Bargaining), and by the cases of Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044, and National Labor Relations Board v. Fansteel Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599. But we think it requires no discussion to disclose that the provisions of Section 12 in no manner are analogous to a "sit-down" strike as defined in any of the statutes or cited decisions.

And as observed by the Supreme Court of the United States in Labor Board v. Jones & Laughlin, supra, the single employee is helpless in dealing with his employer, dependent as in most instances he is upon the daily wage for maintenance of himself and family and unable to safely leave his employment, however aggrieved he as an individual may feel. To all practical purposes, under the terms of this section the employee, though in entire good faith and convinced that material produced by non-union labor is destructive of his interest, yet in order to hold his job and continue to work, must suppress any expression of such conviction.

The Colorado Court in A. F. of L. v. Reilly, supra, declared Section 20 of the Colorado Act as violative of the due process clause of the Fourteenth Amendment. This section required that all labor unions be incorporated. The Court held that this was an unwarranted interference with the union's internal organization affairs and the imposition of unwarranted burdens upon the exercise of the basic rights guaranteed in the bill of rights. The Court in that opinion observed: "Said section is an imposition of a previous general restraint upon the exercise of basic civil rights, and the finding and declaration herein, as previously stated, is founded, and the conclusion of the Court reached, upon that ground."

As to whether or not the provisions of Section 12 contravene the Thirteenth Amendment to the Federal Constitution is a question we may leave to one side and undetermined. Like the Colorado Court, we think the decision may well be rested upon the ground that it violates fundamental and basic civil rights as guaranteed under the Fourteenth Amendment.

## Section 13.

We are persuaded, also, that that part of Section 13 of the Act, making it unlawful to strike except when it is authorized by the vote of the majority of the regular employees working in the business, plant, or in such unit thereof, expressed by a secret ballot, cannot be sustained. As we have previously noted, each individual employee has a right to strike for a legally justifiable purpose, and such a right, of course, rests upon a minority as well as upon a majority. Hardie-Tynes Manufacturing Co. v. Cruise, supra; Welch v. State, 28 Ala.App. 273, 183 So. 879, certiorari denied 236 Ala. 577, 183 So. 886.

This section makes no distinction in what the authorities refer to as a lawful or unlawful strike. It must be construed, therefore, as having application to a perfectly lawful strike for a lawful purpose conducted in a lawful manner. The question, therefore, is whether or not a small group of individuals, for a legally justifiable reason, may be denied the right to strike unless it is by secret ballot, authorized by a majority of the regular employees working in the plant or in the business.

Of course, as we have observed, the right to strike or to refrain from work is a personal, individual right. Reduced to its last analysis, therefore, the question arises as to the reasonableness of a regulation making the right to strike dependent upon the will of others who may not in any manner be connected with, or interested in, the welfare of the minority group. Indeed, these other employees may not belong to or believe in a labor organization.

22

This Act is wholly different from the Wisconsin Act dealt with in Hotel, etc., Employees' Alliance v. Wisconsin Employment Relations Board, 236 Wis. 329, 294 N.W. 632, 640, 295 N.W. 634. In the act there considered the principle of collective bargaining, featured after that of the National Labor Relations Act, was provided, and the question of a strike was left to the determination of the majority of a collective bargaining unit. The Court there observed: "The principle upon which authorized collective bargaining depends is that the rule of the majority within an appropriate collective bargaining unit shall bind the minority." Reference was made to this principle by this Court in Steele v. L. & N. R. Co., 16 So.2d 416,[1] and numerous instances have been noted where the courts have held that in proper cases the minority must yield to the rule of the majority in such bargaining units.

The Wisconsin Court recognized this principle and gave it effect in upholding the Wisconsin statute, but we have no such provision in the Act here under consideration. The denial of the right to strike is made to rest, not upon the rule of the majority of any bargaining unit or in any craft to which the workmen belong, but upon the whim or caprice of others who may be employed in the business, plant, or unit thereof, whoever they may be and whatever views they may entertain as to labor or labor unions. The unit referred to is, of course, the unit of the business or plant, presumably having reference to those larger corporations whose business activities call for separate locations or units.

The principle recognized by the Oregon Court in American Federation of Labor v. Bain, 165 Or. 183, 106 P.2d 544, 555, 130 A.L.R. 1278, holding invalid a statute which prohibited picketing by a minority of the employees of a particular employer as an incident to a labor dispute, has application here. There, of course, was involved the constitutional right of free speech, and the Court observed: "We see no escape from the conclusion that the denial of such a right to the members of a minority is no less an unconstitutional abridgment of the right simply because it is saved to the majority." See also American Federation of Labor v. Swing, 312 U. S. 321, 61 S.Ct. 568, 85 L.Ed. 855, and Goolsby v. State, 213 Ala. 351, 104 So. 901. Of course, a strike is one manner in which labor communicates its position on certain questions to the outside world. The right to strike depends largely upon the purpose for which the strike is called and the manner in which it is conducted.

True, in Dorchy v. Kansas, 272 U.S. 306, 47 S.Ct. 86, 87, 71 L.Ed. 248, is the statement: "Neither the common law, nor the Fourteenth Amendment, confers the absolute right to strike." This, read in connection with the entire opinion, is to be interpreted as meaning that a strike for an unlawful purpose might be forbidden, or that in fact strikes might be by the states regulated under the police power without the violation of the Fourteenth Amendment. We cannot read that case, however, to the end that the state may constitutionally forbid a lawful strike called for a lawful purpose. Vol. I, Secs. 26 and 85, Teller on Labor Disputes and Collective Bargaining.

Nor do we interpret Pittsburgh Plate Glass Co. v. National Labor Relations Board, 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251, or Carpenters' & Joiners' Union v. Ritter's Cafe, supra, as stating any principle in conflict with this conclusion. Indeed, as we interpret this section, the restrictions thus placed on the right to strike may in practical effect amount to a prohibition which, as to a lawful strike, is beyond legislative authority.

And in considering this section, it should be kept in mind, as stated by the Massachusetts Court in Pickett v. Walsh, 192 Mass. 572, 78 N.E. 753, 757, 6 L.R.A.,N.S., 1067, 116 Am.St.Rep. 272, 7 Ann.Cas. 638: "The right of laborers to organize unions and to utilize such organizations by instituting a strike is in exercise of the common law right of every citizen to pursue his calling whether of labor or business, as he in his judgment thinks fit."

But we forego further discussion, as much of the reasoning applicable to Section 12 is likewise to be applied to Section 13. We are well convinced that a prohibition to strike, placed upon a minority group unless sanctioned by secret ballot of others who are without interest in their welfare, is an unreasonable and arbitrary restraint, and must be stricken down.

### Section 15.

In Section 15 it is made unlawful for any labor organization, officer, or agent, or any other person, to collect, receive, or

[1] 245 Ala. 113.

demand directly or indirectly from any person any fee, assessment, or sum of money whatsoever, as a work permit or as a condition for the privilege of work. Excluded from the provisions of this section are initiation fees or dues. In the declaration of policy as found in this Act is the following language: "The right to live involves the right to work. The public and working men and women must be protected. The activities of labor organizations affect the social and economic conditions of the state and the welfare of its citizens. It is declared to be the policy of this state, in the exercise of its police power and in the protection of the public interest, to promote voluntary and peaceful settlement and adjustment of labor disputes and to regulate the activities and affairs of labor organizations, their officers, agents, and other representatives in the manner and to the extent hereinafter provided." Section 1.

In other parts of the body of the Act are declarations to the effect that every person shall be free to join or refrain from joining any labor organization except as provided otherwise in Section 16 of the Act, and nothing in the Act shall impede or diminish any right to strike or the right of individuals to work. It is further declared that nothing in the Act shall be so construed as to invade unlawfully the right of freedom of speech.

■■■ And Section 15 concerns the declared policy of the right to work, a declaration which in fact needed no reiteration, as it is a right universally recognized. One's employment, trade, or calling, is a property right, and the wrongful interference therewith is an actionable wrong. U. S. Fidelity & Guaranty Co. v. Millonas, 206 Ala. 147, 89 So. 732, 29 A.L.R. 520. In Carter v. Knapp Motor Co., supra, the holding was that the right to conduct one's business without the wrongful interference of others is a valuable property right which will be protected if necessary by injunctive process, and that the enjoyment of good name and good will of a business is likewise a valuable property right, subject to like protection.

■■■ In Lash v. State, 244 Ala. 48, 14 So.2d 229, 233, is the observation: "Of course the liberty of contract relating to labor includes both parties to it. The one has as much right to purchase as the other to sell labor." The argument against this section of the Act is in fact rested in large part, if not wholly, upon the contention that it is too indefinite and uncertain, and numerous authorities are cited to the effect that criminal statutes must be explicit. Savage v: Wallace, 165 Ala. 572, 51 So. 605; State v. Skinner, 20 Ala.App. 204, 101 So. 327; Standard Oil v. State, 178 Ala. 400, 59 So. 667; Woco Pep Co. v. City of Montgomery, 213 Ala. 452, 105 So. 214; United States v. L. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516, 14 A.L.R. 1045; Small Co. v. American Sugar Refining Co., 267 U.S. 233, 45 S.Ct. 295, 69 L.Ed. 589; Champlin Refining Co. v. Corporation Commission, 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062, 86 A.L.R. 403. These authorities cited by counsel have been considered, and we think are readily distinguishable. The language is plain—it simply prohibits a charge upon the right of one to work. Illustrations tending to support this view may be found in Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095. Whether or not certain practices to which counsel refer are to be construed as coming within the provisions of the Act are questions which will arise when the proper case is presented.

Expressly excluded are dues and assessments. These are, therefore, not involved. This section was directed towards the practice whereby a person seeking a job is required to obtain a permit or a certificate by the payment of a sum of money to some organization before being permitted to exercise his right to work. The Legislature, in the exercise of its police power, has seen fit to put its stamp of disapproval upon any such practice, and Section 15 was merely to put in force the declared policy of the Act that the right to live involves the right to work. We are persuaded without further discussion that the language here is sufficiently explicit and cannot be condemned for indefiniteness. That it is a proper exercise of the police power appears not to be seriously questioned.

### Section 16.

■■■ In Section 16 the Legislature has seen fit to make it unlawful for any executive, administrative, professional, or supervisory employee to be a member of a labor organization which permits such membership. We have fully recognized, and the point was emphasized in the recent case of Steele v. L. & N. R. Co., supra, the right of these voluntary organizations to determine for themselves who

shall become members. The question is there fully discussed, with citation of supporting authorities. But that conclusion by no means affects the exercise of the broad police power of the State. The question simply is as to whether or not this regulation is within the bounds of reason or is it arbitrary and capricious? As we have observed, if the question is one that is debatable, it is the duty of the Court to sustain the Act. Clearly enough, it is debatable. Indeed, the actions of unions themselves disclose a reasonable ground for this regulation, for the record shows that in a number of unions those occupying supervisory positions here referred to in Section 16 are refused membership in the union. This is rested upon the theory that those unions consider that the superintendent, as to the workmen under him, sits across the table with management, and that his interests lie more with the employer than with the employee.

We might point to the charges contained in Local Union No. 57 v. Boyd, Ala.Sup., 16 So.2d 705,[1] as furnishing some illustration of the reasonableness of this regulation. The bill there was rested upon the theory that the complainant suffered expulsion from the union because, in the exercise of his duties, some of the employees who were members of the same union as complainant, the superintendent, lost their places. In Vol. II, Teller on Labor Disputes and Collective Bargaining, p. 933, the author points out many decisions of the National Labor Relations Board adopting the policy excluding supervisory employees from the bargaining unit where either of the competing labor unions desires their exclusion. And all of this is based upon the reasoning that the supervisory employee is connected with management.

Of course, all of these divisions of opinion concerning the proper place for the supervisory employee revolves around the question of a conflict of interest and as to whether or not one can serve two masters. The proper place for such supervisory employee has often been considered by the National Labor Relations Board, with the result they were held to be more correctly designated with management. Leading to like result is the case of H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309, and International Association Machinists' v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50.

We are persuaded without further discussion that this regulation has a reasonable basis upon which to rest, and that the objections to its validity are not well taken.

The section protects existing insurance contract rights; that is, rights to insurance benefits secured by reason of membership in labor organizations. By reason of this stipulation it may be that as a practical result the restriction imposed will be of a limited nature. As we construe it, it must mean that as to a member of a labor union who had, by reason of such membership or by reason of contract, secured certain insurance benefits which are to be lost upon his separation from the union, advancement to the position of superintendent would not be prohibited. This for the reason that his union connection is essential to the preservation of his benefit contract. Anyone, however, hereafter becoming a member of the union, and by reason of such membership, or by contract, becomes entitled to certain benefits, must yield those benefits by accepting a supervisory position. This for the reason the provisions of Section 16 are before him in the eyes of the law, and he takes his benefits subject thereto. But this relates only to the practical operation of Section 16. As thus construed, we are persuaded that it is a valid provision.

### Section 17.

As to Section 17, making it unlawful for any labor organization or any organization of employers of labor to make financial contributions to any political party or to any person who may be a candidate for any political or party office, and the like, it does not seem to be seriously controverted that so much of said section placing such prohibition upon an organization of employers of labor is invalid under Section 45 of our Constitution because bearing no relation to the subject of the Act. The insistence on the part of defendants is that the separability clause of the Act would justify the Court in eliminating that feature which prohibits an organization of employers of labor from making such contributions, and leaving the prohibition against organizations of employees in force and un-

---

[1] 245 Ala. 227.

impaired. There are numerous cases upon this question of separability, among them being Gibson v. State, 214 Ala. 38, 106 So. 231, to which counsel for defendants refer. Some reference is made to Smith v. Court of County Commissioners, 117 Ala. 196, 23 So. 141, to the effect that the constitutional provisions will only be passed upon when called in question by the party interested.

But this proceeding is under the Declaratory Judgment Act, Code 1940, Tit. 7, §§ 156–168, and all parties to the suit are interested and are desirous that the rights under the Act might be fully determined and their future course thus charted. We think we should proceed upon that basis.

We recognize the force of the argument that the separability clause should be given effect, where possible, to save the Act. But the principle is well understood that a clause of this character may not be invoked to save the Act when in contravention of the obvious legislative intent. State ex rel. Crumpton v. Montgomery, 177 Ala. 212, 59 So. 294; State ex rel. Lister v. Hawkins, 229 Ala. 144, 155 So. 692; Wilkinson v. Stiles, 200 Ala. 279, 76 So. 45; Williams v. Standard Oil Co., 278 U.S. 235, 49 S.Ct. 115, 73 L.Ed. 287, 60 A.L.R. 596. No one can read the provisions of Section 17 without at once coming to the definite conclusion that the Legislature intended to put organizations of employees and employers on the same basis, and that evidently the law-makers thought it would be unjust to prohibit contributions for political campaigns to one and permit them to the other. The two classes are intertwined and so correlated as to our minds disclose the legislative intent of equality in application. We are persuaded, therefore, that the exclusion of the organizations of employers from the provisions of this section must, in order to give effect to the legislative intent, likewise exclude the employees. Such being the case, the whole of Section 17 goes down.

There are a number of sections in the Act the validity of which are in no manner here brought into question. It is clear enough, therefore, that the invalidity of the several sections herein indicated in no manner affects the Act as a whole. And we have already observed that the Act as a whole is entirely valid.

The result of our finding, therefore, is that the Act as a whole is to be sustained, including Sections 7, 15, and 16, under attack in this proceeding; that Section 12, and so much of Section 13 as prevents a strike except by a vote of a majority of the employees in a business, plant, or in a unit of such plant expressed in a secret written ballot, is declared ineffective, together with the provisions of Section 14 intended to make more effective that part of Section 13 as to unlawful strikes; and all of Section 17, are declared to be invalid.

The ruling here as to the invalidity of Section 12 and the portion of Sections 13 and 14 as above indicated, is in accord with the holding of the Court below; and the cross-assignments of error as to these rulings are without merit. Like observation is applicable to Section 17, the ruling here being in accordance with the ruling of the court below. There was no holding in the court below as to the constitutionality of Sections 15 and 16, which are held to be valid.

It results, therefore, that the cross-assignments of error are not well taken, and that the judgment appealed from is due to be affirmed.

Affirmed.

FOSTER, LIVINGSTON, and STAKELY, JJ., concur.

THOMAS and BROWN, JJ., dissent.

THOMAS, Justice (dissenting).

I have only to say that in my opinion the Bradford Act, Acts of Alabama 1943, p. 252, Code 1940, Tit. 26, § 376 et seq., is contrary to organic law, state and federal.

The act offends the rule of duplicity clearly stated in Section 45 of the Constitution of Alabama. Many authorities cited in Code 1940, Const. Art. IV, § 45, p. 98, Vol. 1 uphold this position. See Ballentyne v. Wickersham, 75 Ala. 533; Woolf v. Taylor, 98 Ala. 254, 13 So. 688; White v. Burgin, 113 Ala. 170, 21 So. 832; State v. Southern Ry. Co., 115 Ala. 250, 22 So. 589; Board of Revenue and Road Com'rs of Mobile County v. State ex rel. Roberts, 200 Ala. 456, 76 So. 388; State v. Nelson, 210 Ala. 663, 664, 98 So. 715; Fuqua v. City of Mobile, 219 Ala. 1, 121 So. 697; Fidelity & Deposit Co. v. Farmers' Hardware Co., 223 Ala. 477, 136 So. 824; Houston County Board of Revenue v. Poyner, 236 Ala. 384, 182 So. 455.

The several subjects contained in the title and body of the Bradford Act are "to create a Department of Labor of the State of Alabama and to provide for its personnel, powers, functions, duties and the performance thereof," and "to prohibit executive, administrative, professional, and supervisory employees from becoming members in certain labor organizations."

In my judgment no one can successfully maintain that under the title indicated, two distinct classes and material professions are not contained in the title and body of the act. They are distinct and independent of each other, do not contribute to the full accomplishment of the purpose of the act, nor complement what is otherwise incomplete.

I observe with Chief Justice Stone that, "It follows irresistibly that both the title and the body of the act contain two subjects," and for this reason the Bradford Act must be pronounced a failure as a constitutional enactment and cannot be saved by the rule of severability. Ballentyne v. Wickersham, supra.

Since the matter before us is of public moment (State ex rel. Bland v. St. John, 244 Ala. 269, 13 So.2d 16; Fore v. Alabama State Bridge Corp., 242 Ala. 455, 6 So.2d 508), I wish to add further that sections 7 and 18 of the Bradford Act impose upon such unincorporated, voluntary labor organizations illegal conditions on the liberty of contract, the freedom of assemblage and the right to speak, which voluntary and fundamental rights are guaranteed by our state and federal constitutions.—Constitution of Alabama of 1901, §§ IV and XV; Federal Constitution, First and Fourteenth Amendments.

Such is the effect of the illegal restraint imposed by the enactment in the use of the word "function" when considered as a comprehensive term. It cannot mean less than to operate and is not limited in its use employed in the opinion of the majority. That is to say, this attempted legislation is a limitation on natural rights of individuals constituting the membership of unions. It denies the right of organization of local or national unions, denies the right of dissemination of union views and action touching its federation as a state or national union, and this amounts to a denial of the right of collective bargaining and due consideration of proposed strikes or picketing and the freedom of contract, local or national.

I am in accord with the decision of the Chief Justice in striking down sections 12 and 17 of the act and in holding sections 13 and 14 void in part. The doctrine of severability as construed by this court would not permit the elimination of the illegal sections indicated, and those in the opinion of the Chief Justice, and leave a constitutional enactment, under many authorities that obtain.

BROWN, Justice (dissenting).

Section 45, Article IV of the Constitution is, in part, a charter of our liberty and way of life. It definitely recognizes the fact that all wisdom does not reside in the Legislative Department of the State, that the Legislators in general originate and come from the great body of the common people who constitute the backbone of our civilization, but, nevertheless legislative bodies have in their midst and a part thereof the astute and cunning who represent special interests, above the common good of all the people. And it is a matter of legislative history running back to the foundation of the republic that "Jokers" are embodied in legislative acts to protect and serve private interests to the detriment of the common good, and sometimes to punish some group or faction. Hence said section provides, and we find kindred provisions in most every state in the union: "Each law shall contain but one subject, which shall be clearly expressed in its title."

In Ballentyne v. Wickersham, it was observed: "There was a second abuse, against which this provision was levelled. The subject of the act 'shall be clearly expressed in the title.' The intention of this was, that the title of the act or bill should inform the members of the legislature, and perhaps the public, of the subject on which the former were invited to vote and legislate. Matters foreign to the main objects of the bill had sometimes found their way into bills—surreptitiously, at times, it was charged—and thus the members were induced to vote for measures in ignorance of what they were doing. The constitutional provision intended to render a continuance of this abuse impossible." Ballentyne v. Wickersham, 75 Ala. 533, 536.

What is the subject of Act No. 298, referred to as the Bradford Act? It is not to police and regulate labor in general nor to regulate organized labor in Alabama. The act deals with more than one subject, both in its title and body.

The first subject of the act is a State Department of Labor, and that subject is expressed in the title, "To create a Department of Labor of the State of Alabama, and to provide for its personnel, powers, functions, and duties and the performance thereof." This the act undertakes to do by Sections 3, 4 and 5, 7, 19 and 20.

The next subject just as clearly expressed in the title and dealt with in the body of the act is, "to provide for the appointment by the Governor of boards of mediation, and to provide for their personnel, powers, functions, duties, and procedure." This was provided for in the Code of 1940, Tit. 26, § 28. Provision for the appointment of such boards from time to time is made in § 6 of the act, and the jurisdiction, powers and functions are prescribed and they are authorized to act wholly and independently of the "Department of Labor of the State of Alabama." Said § 6 provides, inter alia: "The board of mediation shall make a finding of facts and a recommendation for settling such strike, lockout, or other dispute or disagreement, and, if such strike, lockout or other dispute or disagreement shall have been submitted for arbitration, a determination or award, which may be enforced by any court of law or equity in the same manner as other determinations or awards of matters submitted for arbitration. Such board shall remain in session no longer than is necessary to accomplish the purposes for which it was appointed, and in no event more than thirty days in which to make a determination, and the board shall be allowed an additional ten days time to make their findings of fact and recommendation for settling such strike, lockout, or other dispute, or disagreement, and, as soon as it shall have rendered its findings of fact, recommendation, determination or award, it shall be discharged. Copies of each finding of facts, recommendation, determination and award shall be submitted to the governor, and the director of the department of labor and to each party or a representative of each party to such strike, lockout, dispute, or disagreement."

The only connection with or relation of the Board of Mediation to the Department of Labor is that a copy of the report made to the Governor must be filed with the Director of the Department of Labor, and when the board makes its report it passes out of existence.

True the boards of mediation are empowered to deal with labor disputes and strikes and controversies between organized labor and the employers of labor. This presents a case strictly analogous to the case presented in Ballentyne v. Wickersham, 75 Ala. 533, 534, 535, 540, where the title was, "An act to establish an Inferior Court of Criminal Jurisdiction for the County of Mobile, and to define the jurisdiction of said court, and the criminal jurisdiction of justices of the peace in said county." The argument that the comprehensive subject was the administration of the criminal law in Mobile County was rejected and the act was held violative of the "second section of the fourth article of the Constitution of 1875", now § 45 of Art. IV of the Constitution 1901, by the court speaking through Justice Stone, because both the title and body of the act contained and dealt with two distinct subjects, though both related to the enforcement of the criminal laws in Mobile County. That application of the constitution of that day is, or may be, regarded by some, as Old Stone's fogyism, but lest we forget, that interpretation, along with its readoption without change, was carried into the present constitution, and is the voice of the people of Alabama, who ratified and adopted it.

Another distinct subject dealt with in the act, both in title and body is, "to prohibit political contributions by labor organizations."

What has that to do with a Department of Labor? It is more nearly related to elections and denies the right of organized labor to speak through the ballot box. True it is, such organizations sometimes see but dimly their real interest, and follow the "will of the wisp" but if they want to be foolish, they have that right under the constitution, so long as other groups are allowed to do so. This is equal protection of law.

Sections 8, 9, 10, 11, 13, 14, 15, 16 and 18 relate to and deal with labor organizations, not through the department of labor, but through a direct legislative mandate, and form a definite and distinct subject, wholly apart from the dominant purpose of the act—to create a Department of Labor. The purpose of these sections is punitive of labor, and no doubt were a dominant force in inducing the enactment of the law.

At the tail end of the Act, § 22 is added to effect a repeal in part of § 28, Title 26 of the Code of 1940, embodied in the chapter on industrial relation. Probably not half

of the members of the Legislature had any knowledge that any such legislation was on foot. Certain it is there is no intimation in the title of the act that this repeal was contemplated.

Glamorous, fulsome and laudatory canons of constitutional and statutory interpretation are often used to camouflage and bolster up doubtful and vicious legislation, and to obscure and set at naught the provisions of the supreme law of the land,— the constitution, which, in the end, must stand as a "pillar of Cloud by day and a pillar of fire by night" if our civilization and way of life are to be preserved, but such glamorous and fulsome rules of statutory interpretation cannot, in our jurisdiction, save an act which is double in its title and body, from the condemnation of § 45 of the Constitution of 1901.

I shall not here collate the authorities, but rest content to refer to the authorities cited by my brother Justice THOMAS, in his dissenting opinion, in which, for reasons stated above, I concur.