416 So.2d 996 (1982)
Hoyt LANKFORD, Bonnie Lankford, Posey O. Pace and Nadean Pace
v.
SULLIVAN, LONG & HAGERTY, a Corporation; Can Tex Industries, a Division of Harsco Corporation; and Texas Vitrified Manufacturing Company.
80-459.
Supreme Court of Alabama.
July 9, 1982.
*998 George White, Gadsden, and R. Ben Hogan, III, of Hogan, Smith & Alspaugh, Birmingham, for appellants.
Charles E. Sharp and John F. Whitaker, of Sadler, Sadler, Sullivan, Sharp & Stutts, Birmingham, for appellee Sullivan, Long & Hagerty.
Larry W. Harper, of Porterfield, Scholl, Clark & Harper, Birmingham, for appellees Can Tex Industries and Texas Vitrified Mfg. Co.
Lanny S. Vines, Birmingham, for amicus curiae The Alabama Trial Lawyers Assn.
L. Murray Alley, Fournier J. Gale, III, and Cathy S. Wright, of Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, for amicus curiae Associated Industries of Alabama.
ALMON, Justice.
This is a products liability case. At issue is the constitutionality of Code 1975, § 6-5-500 et seq. This appeal is from the granting of summary judgment in favor of the defendants/appellees. We reverse.
On May 27, 1980, Hoyt Lankford and Posey O. Pace, employees of the City of Gadsden Waterworks and Sewer Board, were injured when a manlift (a type of elevator) upon which they were riding suddenly collapsed and fell. The accident occurred at the 6th Street South pumping station in Gadsden, Alabama. The two employees and their wives filed suit, alleging that the appellees were negligent in the design, manufacture, installation and inspection of the manlift and that the appellees were negligent as a matter of law under the Alabama extended manufacturer's liability doctrine. The appellees filed a motion for summary judgment based on Code 1975, § 6-5-502.
Section 6-5-502 provides in part:
(a) All product liability actions against an original seller must be commenced within the following time limits and not otherwise:
(1) Except as specifically provided in subsections (b), (c) and (e) of this section, within one year of the time the personal injury, death or property damage occurs; and
(2) Except as specifically provided in subsections (b), (c) and (e) of this section, each element of a product liability action shall be deemed to accrue at the time the personal injury, death or property damage occurs;
(b) Where the personal injury, including personal injury resulting in death, or property damage (i) either is latent or by its nature is not discoverable in the exercise of reasonable diligence at the time of its occurrence, and (ii) is the result of ingestion of or exposure to some toxic or harmful or injury-producing substance, element or particle, including radiation, over a period of time as opposed to resulting from a sudden and fortuitous trauma, then, in that event, the product liability action claiming damages for such personal injury, or property damage must be commenced within one year from the date such personal injury or property damage is or in the exercise of reasonable diligence should have been discovered by *999 the plaintiff or the plaintiff's decedent, and in such cases each of the elements of the product liability action shall be deemed to accrue at the time the personal injury is or in the exercise of reasonable diligence should have been discovered by the plaintiff or the plaintiff's decedent; and
(c) Notwithstanding the provisions of subsections (a) and (b) of this section, a product liability action against an original seller must be brought within 10 years after the manufactured product is first put to use by any person or business entity who did not acquire the manufactured product for either resale or other distribution in its unused condition or for incorporation as a component part in a manufactured product which is to be sold or otherwise distributed in its unused condition.
The undisputed facts submitted by the appellees showed that the manlift was installed in late 1964 or early 1965 by Sullivan, Long & Hagerty. The accident occurred some fifteen years later and as a result this suit would be barred by subsection (c) of § 6-5-502.
Appellants contend that § 6-5-500 et seq. (Act No. 79-468) violates Article I, § 13, of the Alabama Constitution. Section 13 provides "[t]hat all courts shall be open; and that every person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law; and right and justice shall be administered without sale, denial, or delay."
Section 13 has been considered at length by several recent opinions of this Court. The standards of review and the results of cases decided on the basis of § 13 have been somewhat divergent.[1] We trust that this opinion will make clear this Court's review of § 13.

I

APPROPRIATE STANDARD OF REVIEW
The principles set out by Justice Shores in her concurring opinion in Fireman's Fund American Insurance Co. v. Coleman, 394 So.2d 334 (Ala.1980), best describe what we perceive to be the appropriate standards of review and also the rationale for the review. Due to the importance we attach to the principles stated by Justice Shores, we quote at length from her opinion:
"The language of the provision [§ 13] is not unique. Thirty-seven other states include a similarly-worded provision in their constitutions, A. E. Dick Howard, The Road from Runnymede, Appendix; indeed, its origins can be traced back to the Magna Charta. 2 Coke, Institutes, Cap. 29, p. 56. Although its language is broad enough to be subject to varying interpretations, it can generally be said to incorporate into our constitution a fundamental principle of fairness, a perhaps vaguely conceived but important notion of limitation on the power of government to infringe upon individual rights, and to act arbitrarily. What those rights are, what degree of infringement is permitted, and with how much justification, are inquiries which have been the subject of long-standing debate, and have puzzled minds more perspicacious than mine. Underlying all of these inquiries is the oft-unstated but all pervasive question of who is to answer them: legislature or courts? How do courts supply content to the provision without overstepping their traditional role and legislating themselves? The answers to these questions are important, for too literal a reading of the prohibitions of § 13 may effectively preclude governmental action in areas of crucial public concern; too broad a reading eviscerates the very rights the section was intended to protect.

*1000 ". . . .
"... The rights guaranteed include those possessed at common law by individuals injured by wrongful acts of others, and their redress must be sought through the courts....
". . . .
"Legislation which abolishes or alters a common-law cause of action, then, or its enforcement through legal process, is automatically suspect under § 13. It is not, however, automatically invalid. Grantham, [v. Denke, 359 So.2d 785 (Ala. 1978)], itself restates the established rule that such legislation will survive constitutional scrutiny if one of two conditions is satisfied:
1. The right is voluntarily relinquished by its possessor in exchange for equivalent benefits or protection, or

2. The legislation eradicates or ameliorates a perceived social evil and is thus a valid exercise of the police power.
I find it helpful to think of these alternatives as two different aspects of the quid pro quo concept: Thus, a right may be abolished if the individual possessor receives something in return for it (the individual quid pro quo dwelt upon in Grantham), or if society at large receives a benefit (thereby justifying exercise of the police power.)
". . . .
"Of the dozens of cases decided under § 13, however, there are many which involve no deprivation of common-law causes of action, and in which the Court has declined to exercise a stricter than normal standard of review.... In this type of case, § 13 is construed as a general prohibition against arbitrary and capricious governmental action. The Court quite properly exhibits a high degree of deference to the legislative decision-making process in these situations because the guidelines for review are so vague. Where common-law causes of action for injury are impaired, however, the mandate of § 13 is explicit."
The review articulated by Justice Shores is a two-tiered approach. Where common-law rights are altered or abolished, this Court will review such legislation more strictly than normal. Where no common law right is affected, a judicial deference to the legislature is required; however, the legislation may not be arbitrary or capricious.
It is argued by the appellees that because privity was required at common law to maintain an action such as this one, no common law right is altered and hence we should not apply the more strict standard of review. However, the statute of repose contained in § 6-5-502(c) is a bar to all actions whether or not there is privity. To base our review on whether or not there is privity would be to avoid the real issue; and because we would reach the same result under either standard of review, we do not think the issue of privity is determinative.

II

REVIEW OF A COMMON LAW RIGHT
Proceeding with our § 13 review, we must be mindful of the fact that it is not for the courts to determine the wisdom of legislation. The only provision for the court is one of power. Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 18 So.2d 810 (1944). Justice Shores further stated in her concurring opinion in Fireman's Fund, supra:
"In short, the power of the legislature is plenary, except where limited by the constitution. Where legislation infringes upon a right protected by § 13, however, we are dealing with a limitation on the power of the legislature. By determining the validity of such legislation, we do not pass judgment on its wisdom, but follow our own supreme mandate to uphold the constitution of this state.
"When examining statutes which have an impact on rights protected by § 13, then, our scrutiny must be sharper than that exercised in cases which involve no constitutionally guaranteed rights. While the legislature must make the initial determination that the benefits provided *1001 by a statute to society or to the injured individual justify the infringement on common-law rights, we must exercise a meaningful review of that decision."

A. Quid Pro Quo

In applying the guidelines we have herein set out to § 6-5-502(c), it is easily decided, as the trial judge found, that there is no quid pro quo which can sustain it. We, therefore, must determine if the challenged statute eradicates a perceived social evil.

B. Eradication of a Social Evil

In this regard, it is not enough for the legislature to merely characterize the problem as a "social evil" and then recite in the enacting clause that the legislation is directed to that evil. There must be a substantial relationship between the act and the eradication of the evil. The trial judge applied a somewhat more lenient test in upholding the statute.
The "social evil", as perceived by the legislature and as set out in § 6-5-500, is:
"... that product liability actions and litigation have increased substantially, and the cost of such litigation has risen in recent years. The legislature further finds that these increases are having an impact upon consumer prices, and upon the availability, cost and use of product liability insurance, thus, affecting the availability of compensation for injured consumers. Therefore, it is the intent of the legislature to provide a comprehensive time framework for the commencement and maintenance of all product liability actions brought in this state."
As we have previously stated, it is not our place to review the legislature's decision as to what is a "social evil"; rather our review is directed to the question whether a substantial relationship exists between the evil and the legislature's attempt to eradicate the evil. It is in this regard that we find § 6-5-502(c) violative of § 13.
To say that barring claims involving products that have been used for more than 10 years will eradicate and ease the cost increases in consumer prices and product liability insurance is unreasonable in our opinion.
At the outset of our analysis, we wish to acknowledge that Professor Francis McGovern's article, The Variety, Policy and Constitutionality of Product Liability Statutes of Repose, 30 Am.U.L.Rev. 579 (1981), has been quite helpful and informative in our deliberation.
"Although a statute of repose certainly would reduce recoveries by persons injured by products, there may not be a corresponding reduction in insurance premium rates. An eight-to-ten year statute of repose, for example, would be too long to improve the predictability of insurance claims." McGovern, supra, page 595, citing the Final Report of the Federal Interagency Task Force on Product Liability.
The Federal Interagency Task Force was established by the Economic Policy Board of the White House after claims by manufacturers that a products liability crisis had developed that rendered products liability insurance unaffordable or even unavailable. The Task Force undertook a study during 1976 and 1977. It sponsored symposiums, sought information from numerous insurance and manufacturing organizations, analyzed data collected from congressional hearings, and commissioned studies by independent contractors. The final report was published on November 1, 1977. On January 12, 1979, the Commerce Department published a draft of a Model Uniform Product Liability Act. A final version of the Act was published on October 31, 1979. 44 Fed.Reg. 62,714 (1979). [The above information on the Task Force was taken from Note, Alabama's Products Liability Statute of Repose, 11 Cum.L.Rev. 163 (1980)].
Even though the Task Force and others have alluded to the "long-tail" claims problem, as far as this Court can ascertain the problem has not been documented. See Massery, Date-of-Sale Statutes of LimitationA New Immunity for Product Suppliers, *1002 1977 Ins.L.J. 535, 546. Indeed, the appellees point us to no manifestation of an insurance crisis. Even if there was evidence of a national crisis, that still would not provide the necessary relationship to uphold the statute. The effect of the crisis on this State would still have to be shown. As was noted in Note, The Utah Product Liability Limitation of Action: An Unfair Resolution of Competing Concerns, 1979 Utah L.Rev. 149, a survey by the Utah Manufacturers' Association suggested that insurance rate increases are not the result of the number of product liability claims in Utah. The author concluded that the Utah tort-litigation system had not contributed to the increase in insurance costs. "Although assuring the availability of reasonably priced products liability insurance is an admirable goal, it will not be accomplished or even furthered by limiting access to courts in this State where such access is seldom sought." 1979 Utah L.Rev. 149, 151.
In § 101 of the Model Uniform Product Liability Act proposed by the U. S. Department of Commerce, it is stated that:
"Product liability insurance rates are set on the basis of countrywide, rather than individual state, experience. Insurers utilize countrywide experience because a product manufactured in one state can readily cause injury in any one of the other states, the District of Columbia, or the Commonwealth of Puerto Rico. One ramification of this practice is that there is little an individual state can do to solve the problems caused by product liability."
44 Fed.Reg. 62,714, 62,716 (1979).
The findings listed after § 101 of the Model Act indicate that studies done by the states of Maine and Georgia emphasize that individual state tort reforms can do little to affect the product liability problem and will not stabilize product liability insurance rates. 44 Fed.Reg. 62,714, 62,716 (1979).
"The limited available data show that insurers' apprehension about older products may be exaggerated. See "ISO Closed Claims Survey" at 105-08 (indicating that over 97 percent of product-related accidents occur within six years of the time the product was purchased and, in the capital goods area, 83.5 percent of all bodily injury accidents occur within ten years of manufacture). Nevertheless, as the "Task Force Report" indicated, the underwriters' concern about potential losses associated with older products may be an important factor in the recent increase in liability insurance premiums for manufacturers of durable goods. See "Task Force Report" at VII-21. [The word `potential' was emphasized in the original; other emphasis added.]"
Analysis to § 110 of the Model Act, 44 Fed.Reg. 62,714, 62,733.
The Insurance Services Office (ISO), Closed Claim Survey, cited above, indicated that only 2.7 percent of the products involved in products liability actions were purchased more than six years prior to the injury-causing event.
"The results of this study cannot be over-emphasized. Initiated by the insurance industry and conducted by the Insurance Services Office, the ratemaking arm of the industry, the study encompassed 7,800 claims closed between July 1 and November 1, 1976 by 23 of the largest property and casualty insurance companies in the country."
Massery, supra, at 542.
The Task Force also determined that "[p]roduct insurance usually provides coverage on what is called `occurrence' basis, whereby coverage is provided for all product-related damages that occur during the policy period. Neither the time of manufacture of the product nor the time at which the claim is made determines whether the policy provides coverage." Task Force Final Report, supra, at V-5.
The appellees also make note of the fact that the machine in question operated without incident for 15 years and that this fact alone must be seen as proof that at the time of sale it was in fact a safe design. We do not think that fact establishes or could establish the necessary relationship between the statute and the perceived social evil. It is interesting to note that according to the 1974 Census of U. S. Civil Aircraft, the average age of a Boeing 707 then in use was 10 years. Massery, supra, at 543. Massery also cites the case of Adams v. *1003 General Dynamics Corp., 405 F.Supp. 1020 (N.D.Cal.1975), as an example of the harshness of a products liability statute of repose. In that case, 12 Air Force personnel were killed in a crash of a 20-year-old Convair T-29. Discovery in the case revealed that the manufacturer had long been aware of the incidence of defective frame castings in this model aircraft, which resulted in the crash, yet failed to warn of the danger. If an absolute statute of repose had been in force, the plaintiffs would have been barred from suit, despite the fact that the manufacturer may have hidden the defect from the aircraft's users.
"Manufacturers are right in asserting that they should not be held liable for injuries that occur simply because a product wears out. But no uniform wearing-out time should be enacted for all products alike by means of a statute of limitations. The lives of different products vary widely, as do the lives of similar products depending on the extent of their use and maintenance."
Phillips, An Analysis of Proposed Reform of Products Liability Statutes of Limitations, 56 N.C.L.Rev. 663 (1978).
One study revealed that 50 percent of all tractors surveyed had a life-span of more than 10 years. Doss & Tfister, Nature and Extent of Farm Machinery Use in Relation to Frequency of Accidents in Michigan and Ohio, 1972 (Agricultural Engineering Department, Michigan State University).
The Task Force Report found the existence of insurance problems, but not problems amounting to an insurance crisis. The Task Force identified three causes of the problems: (1) insurance rate-making procedures; (2) uncertainties in tort law; and (3) unsafe manufacturing practices. Task Force Report at 1-21. So even though the Task Force identified insurance problems, it did not indicate that a statute of repose was a solution to any of the problems encountered. We conclude that there is not a sufficient relationship between the statute and the perceived social evil to sustain the statute.

III

REVIEW OF A NON-COMMON LAW RIGHT
This leads us to the review of statutes which do not abrogate a common law right. Under this review, the statute must not be arbitrary or capricious. In this regard we find the statute quite arbitrary. Section 6-5-502(c) states that a product liability action must be brought within ten years after the first use of the product.
The statute, by tying the period to date of use, as opposed to the accrual date of the cause of action, would permit a purchaser of a defective product to sue for injuries received nine years and eleven months after the first use, whereas it would bar the action of a purchaser who was injured by the same defective product ten years and one month after he first used the product.
Another arbitrary aspect of the statute, which might more properly be classified as a due process problem, is that it does not provide for an extension of the limitation period for someone injured shortly before the expiration period. Suppose a person was injured on the last day of the ten-year period; presumably he would have to file suit that very day or else be barred by the statute. Thus the limitation period effected by the statute ranges from one day to one year, depending upon when the injury occurs. This is clearly arbitrary. The statute has no savings clause to provide for those injuries occurring near the expiration of the ten-year period.
The harshness of an absolute date-of-use limitation period is evident when compared to the Model Uniform Product Liability Act proposed by the Commerce Department. Section 110(B)(1) of the Act states:
"In claims that involve harm caused more than ten (10) years after time of delivery, a presumption arises that the harm was caused after the useful safe life had expired. This presumption may only be rebutted by clear and convincing evidence." (emphasis added)
The Model Act merely creates a presumption and does not provide for an absolute cut-off date.
*1004 Even though we have characterized our standard of review, under § 13, of laws not affecting common law rights, as one of judicial deference to the wisdom of the legislature, a law which is arbitrary on its face cannot be upheld.

IV

CONCLUSION
It is therefore the judgment of this Court that Code 1975, § 6-5-502(c), is unconstitutional as violative of Article I, § 13, Constitution 1901.
This decision should not be interpreted, however, as a holding that all limitations on the liability of manufacturers of products are prohibited by § 13.
The order of the circuit court granting summary judgment is hereby reversed and the cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
SHORES, EMBRY and ADAMS, JJ., concur.
TORBERT, C. J., and JONES and BEATTY, JJ., concur specially.
FAULKNER, J., concurs in the result.
TORBERT, Chief Justice (concurring specially).
I agree that § 6-5-502(c) should be struck down as unconstitutional for the reasons set out in section III of the majority opinion. By stating that a product liability action must be brought within ten years after the first use of the product, without providing some kind of "grace" period for those injured in the last year or so of the ten-year period of repose, § 6-5-502(c) arbitrarily deprives those persons, whose cause of action has accrued, of their right to bring that action, and thereby denies them due process and equal protection of the laws. See, U.S.Const. amend. XIV, § 1; Ala.Const. art. I, §§ 1, 6, 13.
Several problems arise in this context. Statutes of repose, such as § 6-5-502(c), make an unreasonable distinction between similarly situated manufacturers, in that the makers of long-lived products may be insulated from liability, while makers of short-lived products are singled out for product liability. While the Legislature would be entitled to make such classifications among various types of products, the present statute makes the class into which an individual manufacturer or plaintiff may fall a matter of chance. This deprives both plaintiffs and manufacturers of equal protection under the laws. See, McGovern, The Variety, Policy and Constitutionality of Product Liability Statutes of Repose, 30 Am.U.L.Rev. 579, 606-612 (1981).[1]See also, Twerski & Weinstein, A Critique of the Uniform Product Liability LawA Rush to Judgment, 28 Drake L.Rev. 221, 234-44 (1978).
The United States Supreme Court recognized this problem in Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), when it stated:
"In applying that clause, this Court has consistently recognized that the Fourteenth Amendment does not deny to States the power to treat different classes of persons in different ways.... The Equal Protection Clause of that amendment does, however, deny to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification `must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'" [Citations omitted.]
404 U.S. at 75-76, 92 S.Ct. at 253-254. These same principles have been followed by this Court. Harrison v. Buckhalt, 364 So.2d 283 (Ala.1978); City of Hueytown v. Jiffy Chek Co., 342 So.2d 761 (Ala.1977); Ex parte Rice, 259 Ala. 570, 67 So.2d 825 (1953). Thus, Alabama courts have held that the "essence of the theory of equal protection of the laws is that all similarly *1005 situated be treated alike. An individual cannot be subjected to arbitrary exercise of governmental power." City of Hueytown v. Jiffy Chek Co., 342 So.2d at 762. See also, Vernon v. State, 245 Ala. 633, 18 So.2d 388 (1944).
If the Legislature is to properly make classifications in statutes, specific guidelines should be followed. This Court, in Opinion of the Justices, 252 Ala. 527, 41 So.2d 775 (1949), commented upon these standards:
"While the due process and equal protection guaranties are not coterminous in their spheres of protection, equality of right is fundamental in both. Each forbids class legislation arbitrarily discriminatory against some and favoring others in like circumstances.Beeland Wholesale Co. v. Kaufman, 234 Ala. 249, 174 So. 516; Washington Nat. Ins. Co. v. Board of Review, [1] N.J. [545] 64 A.2d 443. It is essential that the classification itself be reasonable and not arbitrary, and be based upon material and substantial distinctions and differences reasonably related to the subject matter of the legislation or considerations of policy, and that there be uniformity within the class. Washington Nat. Ins. Co. v. Board of Review, supra."
252 Ala. at 530, 41 So.2d 775. Applying these standards to § 6-5-502(c), it becomes apparent that it is arbitrary and capricious, thus violating the rights of these plaintiffs to equal protection under the law.
One scholarly commentator has stated:
"Alabama's statute of repose creates a seemingly arbitrary distinction between those individuals who are injured immediately prior to and those individuals who are injured immediately subsequent to the termination of the ten-year period. Therefore, the statute may also be amenable to suit on equal protection grounds."
Comment, Alabama's Products Liability Statute of Repose, 11 Cum.L.Rev. 163, 177 (1980). While this commentator states this as an equal protection violation, I consider it to also give rise to due process problems. Without a savings clause to provide for those injuries occurring near the expiration of the ten-year period, this ten-year period of repose is a violation of due process. While there is no constitutional rule that prohibits a legislature from abolishing a right of action before it accrues, Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 87-88, 98 S.Ct. 2620, 2637-38, 57 L.Ed.2d 595 (1978); Street v. City of Anniston, 381 So.2d 26 (Ala.1980), a cause of action that has accrued (such as a product liability-related injury to a party nine years and eleven months from the first use of the product) is squarely within the protection of the due process clause and is thus protected from arbitrary interference. Gibbes v. Zimmerman, 290 U.S. 326, 54 S.Ct. 140, 78 L.Ed. 342 (1933); Barr v. Preskitt, 389 F.Supp. 496 (M.D.Ala.1975). When a right of action accrues, it becomes the property of the injured party and its subsequent destruction is subject to the due process clauses of the United States and Alabama Constitutions. Barr v. Preskitt, 389 F.Supp. at 498.
It is within the province of the Legislature to modify an accrued right of action if it provides a reasonable alternative by which to enforce that right, but where, as here, a statute does not do so, it violates due process. Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); Second Employers' Liability Cases, (Mondou v. New York, NH & HR) 223 U.S. 1, 32 S.Ct. 169, 56 L.Ed. 327 (1911). Legislation of this type should incorporate the time periods of other statutes of limitations, for without such incorporation, an injury occurring near the end of the ten-year period of respose effectively denies a reasonable time in which to seek a remedy. Due process requires that statutes of limitation allow an individual a reasonable time in which to bring suit. Anderson Nat. Bank v. Luckett, 321 U.S. 233, 64 S.Ct. 599, 88 L.Ed. 692 (1944); Capitan Grande Band of Mission Indians v. Helix Irrigation District, 514 F.2d 465 (9th Cir. 1975). Likewise, a statute of repose that does not embody a flexible outer limit to allow a reasonable time *1006 for suit when an injury occurs near the end of the statutory period also denies constitutionally required due process. Wilson v. Iseminger, 185 U.S. 55, 22 S.Ct. 573, 46 L.Ed. 804 (1902); Oole v. Oosting, 82 Mich. App. 291, 266 N.W.2d 795 (1978).
In Oole v. Oosting, the Michigan Court of Appeals addressed this issue. The court stated:
"As to causes of action which accrue prior to the expiration of six years, the statute is one of limitation, because it requires that the action be brought within a specified period of time. If a cause of action accrued near the end of the six-year period, and a discovery period could not be read into the statute, a person may not have a reasonable period of time within which to bring suit, and the statute may operate to deprive that person of his cause of action without due process."
266 N.W.2d at 799. Where a party's injuries occur subsequent to the date set by the statute of repose, there is no due process violation, because, as stated, that is within the province of the Legislature. Limitations upon a right that has not yet accrued, when uniformly and equally applied, are constitutional. Parton v. City of Huntsville, 362 So.2d 898 (Ala.1978); Parker v. Jefferson County Commission, 347 So.2d 1321 (Ala.1978). In Wilson v. Iseminger, 185 U.S. 55, 22 S.Ct. 573, 46 L.Ed. 804 (1902), the United States Supreme Court stated:
"It may be properly conceded that all statutes of limitation must proceed on the idea that the party has full opportunity afforded him to try his right in the courts. A statute could not bar the existing rights of claimants without affording this opportunity; if it should attempt to do so, it would not be a statute of limitations, but an unlawful attempt to extinguish rights arbitrarily, whatever might be the purport of its provisions. It is essential that such statutes allow a reasonable time after they take effect for the commencement of suits upon existing causes of action; though what shall be considered a reasonable time must be settled by the judgment of the legislature, and the courts will not inquire into the wisdom of its decision in establishing the period of legal bar, unless the time allowed is manifestly so insufficient that the statute becomes a denial of justice. Cooley, Const.Lim. 451.
"Thus, in Terry v. Anderson, 95 U.S. 628, 24 L.Ed. 365, it was said per Chief Justice Waite:
"`This court has often decided that statutes of limitation affecting existing rights are not unconstitutional, if a reasonable time is given for the commencement of an action before the bar takes effect. Hawkins v. Barney, 5 Pet. [30 U.S.] 457, 8 L.Ed. 190; Sohn v. Waterson, 17 Wall. [84 U.S.] 596, 27 L.Ed. 737.'"
185 U.S. at 62-63, 22 S.Ct. at 575. From these authorities it becomes apparent that when a person is injured, for instance, nine years, eleven months, and three weeks after the product was first put into use, that person is deprived of a reasonable time to pursue his remedy. Thus, without an incorporation of other statutes of limitations, the party would have one week or less in which to pursue his remedy. This is clearly not a reasonable time as defined by the United States Supreme Court and the statutory time period is therefore an arbitrary denial of rights and a violation of due process.
It is my view that the Legislature should provide by statute so that no manufacturer should be held liable for an indefinite period of time. Yet, an arbitrary ten-year period, without more, such as that set out by § 6-5-502(c), is a denial of equal protection under U.S.Const. amend. XIV, § 1, and Ala. Const. art. I, § 1. "A manufacturer should be required to produce a product that can be safely used during the period of its intended use, not for some arbitrary period of time that is applied to all products. A statute that would take into account the period of the product's intended use would not favor some groups of manufacturers to the exclusion of others, nor would it be unfair to injured individuals." Comment, Alabama's Products Liability Statute of Repose, 11 Cum.L.Rev. 163, 180 (1980).
*1007 Likewise, I further believe that § 6-5-502(c) violates the due process clauses of the United States and Alabama Constitutions. U.S.Const. amend. XIV, § 1; Ala.Const. art. I, §§ 6, 13. For these reasons, I feel that the requirements of due process and equal protection of the law compel me to concur with the majority in its holding that § 6-5-502(c) should be struck down as unconstitutional.
BEATTY, J., concurs.
JONES, Justice (concurring specially).
I agree with the majority opinion, both as to its holding and as to its rationale. I write specially to explain that I have no quarrel with the majority's reference to "common law" as the source of those rights protected by § 13, so long as "common law" is used and understood in its broadest sense. A right of such fundamental character as contemplated by § 13 may have its source in the legislative process, customs and practice, or in the judicial process. It is the nature and character of the right, i.e., its being so engrained into the fabric of the law as to acquire a fundamental and basic status, rather than its source, that dictates § 13's protective applicability.
By the same token, not every right which evolved through the "common law," as that term is used in its narrower sense, is protected under § 13. Again, the test is whether the right sought to be abolished or modified has acquired such a basic and fundamental status as to constitute an indelible thread in the fabric of our law. And even what is fundamental, as that term is here used, is determined by an evolving standard subject to the changing mores and social climate of our society. For example, the right to seek redress for breach of promise, which was once well established as a common law right, was reduced through changing societal values to something less than a fundamental right and was abolished without offense to § 13. On the other hand, the right of privacy, apart from its influence on other fundamental rights guaranteed by the Constitution, such as the prohibition against unreasonable searches and seizures, may some day evolve into a right of such fundamental status that civil remedies for its breach will fall under the protective umbrella of § 13.
NOTES
[1] The author would like to note that the case of Mayo v. Rouselle Corp., 375 So.2d 449 (Ala. 1979), did not help in developing a clearly recognized standard of review for § 13. In Mayo, the statute was upheld against a § 13 attack, on the authority of Pickett v. Matthews, 238 Ala. 542, 192 So. 261 (1939). That rationale is questionable at best. It should also be noted that the remedies sought in Mayo were not enjoyed at common law.
[1] As indicated by Justice Almon, we are appreciative of Professor McGovern's scholarly and fair analysis of the law concerning statutes of repose.