**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| CHRISTOPHER G. YANAKOS, SUSAN KAY YANAKOS AND WILLIAM RONALD YANAKOS, HER HUSBAND, | : | No. 10 WAP 2018 |
| | : | |
| | : | Appeal from the Order of the Superior |
| | : | Court entered July 26, 2017 at No. |
| Appellants | : | 1331 WDA 2016, affirming the Order |
| | : | of the Court of Common Pleas of |
| | : | Allegheny County entered August 29, |
| v. | : | 2016 at No. GD-15-022333. |
| | : | |
| | : | ARGUED: October 24, 2018 |
| UPMC, UNIVERSITY OF PITTSBURGH PHYSICIANS, AMADEO MARCOS, M.D. AND THOMAS SHAW-STIFFEL, M.D., | : | |
| | : | |
| | : | |
| | : | |
| Appellees | : | |

**DISSENTING OPINION**

**JUSTICE WECHT**                                 **DECIDED: OCTOBER 31, 2019**

A majority of the Court concludes that the General Assembly's application of a seven-year statute of repose to most medical professional liability claims violates Article I, Section 11 of the Pennsylvania Constitution, which provides that every person who suffers an injury "shall have remedy by due course of law[.]"[1] I am unable to agree. Both the lead Opinion and the Concurring and Dissenting Opinion flout the General Assembly's policymaking authority by constitutionalizing and imposing a standard that neither the text nor the history of our Constitution supports. Because existing jurisprudence supplies a different standard, and because it is not this Court's role to upend duly enacted legislation

---

[1] PA. CONST. art. 1, § 11.

simply because we might sometimes deem it imperfect or unwise, I must respectfully dissent.

Article I, Section 11, which is part of our Constitution's Declaration of Rights and has remained essentially unchanged since its introduction in the Constitution of 1790, provides that:

> All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.

PA. CONST. art. 1, § 11.

At issue is the right to a "remedy by due course of law" language. This wording is found in the constitutions of at least thirty-nine states, but has no counterpart in the federal constitution. *Ieropoli v. AC&S Corp.*, 842 A.2d 919, 925 (Pa. 2004). Such provisions, commonly referred to as remedies clauses, derive from Magna Carta and Sir Edward Coke's seventeenth century commentary on the Great Charter, which influenced the drafters of many early American state constitutions.[2] JENNIFER FRIESEN, STATE CONSTITUTIONAL LAW: LITIGATING INDIVIDUAL RIGHTS, CLAIMS, AND DEFENSES § 6-2(a) (3d ed. 2000).

Some state supreme courts have concluded that various statutes of limitations and statutes of repose violate their constitutions' Remedies Clauses.[3] Yet considerable

---

[2] Magna Carta included the following promise from King John aimed at curtailing the selling of court writs: "To no one will we sell, to no one will we refuse or delay, right or justice." In his commentary on this article, Lord Coke wrote that "every Subject of this Realm, for injury done to him in [goods, lands, or person], . . . may take his remedy by the course of the Law." JENNIFER FRIESEN, STATE CONSTITUTIONAL LAW: LITIGATING INDIVIDUAL RIGHTS, CLAIMS, AND DEFENSES § 6-2(a) (3d ed. 2000).

[3] *Reynolds v. Porter*, 760 P.2d 816 (Okla. 1988) (invalidating a three-year limitations period without discovery rule in medical malpractice suits); *Hanson v. Williams Cty.*, 389 N.W.2d 319 (N.D. 1986) (invalidating ten-year date-of-use statute of repose for products-

disagreement persists among state courts over the correct interpretation of Open Courts

provisions and Remedies Clauses.  For every decision striking down a statutory restriction

on a common law cause of action, one could find another decision (likely in a state with

an identical Open Courts provision) upholding a similar restriction.  *See* Hon. Thomas R.

Phillips, *The Constitutional Right to A Remedy*, 78 N.Y.U. L. REV. 1309, 1314-15 (2003)

("In each section of the country, whether the constitution is old or new, the judges elected

or appointed, or the political culture traditional or progressive, some state courts defer

unhesitatingly to legislative choices, while others routinely strike down any statutes that

impede access to the courts or impair recovery under traditional theories.").

To complicate matters further, the ordinary challenges of constitutional

interpretation are magnified because the historical record does not reveal what led the

framers of early state constitutions to embrace Open Courts provisions.[4]  Those few

documents that survive from Pennsylvania's 1790 constitutional convention do not

describe any debates about the Open Courts provision generally, nor the Remedies

Clause specifically.  So it is not clear what the drafters meant when they guaranteed a

remedy "by due course of law" for every injury.  Perhaps they understood "due course of

law" to mean "the law of the land," in which case Article I, Section 11 merely guarantees

---

liability claims); *Strahler v. St. Luke's Hosp.*, 706 S.W.2d 7 (Mo. 1986) (finding statute of limitations in medical malpractice case unconstitutional as applied to minors); *Kenyon v. Hammer*, 688 P.2d 961 (Ariz. 1984) (invalidating absolute limitations bar on medical malpractice claims three years from date of injury); *Jackson v. Mannesmann Demag Corp.*, 435 So.2d 725 (Ala. 1983) (invalidating a seven-year statute of repose for claims against architects, contractors, and builders).

[4]     *See* KEN GORMLEY ET AL., THE PENNSYLVANIA CONSTITUTION: A TREATISE ON RIGHTS AND LIBERTIES, at 470 (2004) (explaining that notes from Pennsylvania's 1790 constitutional convention do not clarify the thinking behind the Open Courts provision); Note, *Constitutional Guarantees of a Certain Remedy*, 49 IOWA L. REV. 1202, 1203-1204 (1964) ("[R]ecords of the constitutional conventions which adopted certain-remedy clauses are virtually devoid of any clues as to the intentions of the framers.").

a right to "whatever remedy the law allows." *See Meech v. Hillhaven West, Inc.*, 776 P.2d 488, 493 (Mont. 1989) (explaining that Montana's Open Courts provision is "a section dealing with the administration of justice," and is "addressed to securing the right to set the machinery of the law in motion"); *Harrison v. Schrader*, 569 S.W.2d 822, 827 (Tenn. 1978) ("The constitutional guaranty providing for open courts and insuring a remedy for injuries does not guaranty a remedy for every species of injury, but applies only to such injuries as constitute violations of established law of which the courts can properly take cognizance."). Or maybe the drafters intended to constitutionalize then-existing common law remedies, thus shielding those remedies from legislative modification or abolition absent a constitutional amendment. We don't know.

Faced with this lack of authoritative guidance, Pennsylvania courts—along with many other state courts—have struggled for well over a century to define what, if any, limits the Remedies Clause imposes on the legislature's authority to modify or abolish common law causes of action. Indeed, significant disagreement persists among judges and scholars as to whether the "by due course of law" language found in most Open Courts provisions presupposes that the legislature has the authority to decide what "course of law" is "due" in any given circumstance. Some have questioned why the promise of a remedy for every "injury" necessarily should preclude the legislature from defining what constitutes a "legal injury" in the first instance. *See Carroll*, 437 A.2d at 399 (Larsen, J., dissenting).

Though these substantial difficulties have resulted in divergent interpretations among and between different courts, the lead Opinion barely mentions them. Instead, the lead Opinion simply takes for granted that intermediate scrutiny "must apply" given the right to a remedy's "historical significance" and its "explicit inclusion in our constitution." Lead Opinion at 11. The matter is not so simple. As I explain in more detail

below, the "intermediate scrutiny" standard that the lead Opinion adopts is inconsistent with our existing Remedies Clause jurisprudence, and derives from neither the text nor the history of our Constitution.

Although the framers' intent in drafting Pennsylvania's original Open Courts provision is somewhat opaque, the circumstances that precipitated the 1790 constitutional convention are well understood. When Pennsylvania's first Constitution was ratified in 1776, "the legislative branch was seen as the people's servant and salvation," while "the executive branch was distrusted." GORMLEY ET AL., *supra*, at 471. The Pennsylvania Constitution of 1776 reflected this underlying political philosophy. It created a "unitary government in which legislative power, and supervisory power over both the executive and the judiciary, were concentrated in a single annually elected Assembly." Matthew J. Herrington, *Popular Sovereignty in Pennsylvania 1776-1791*, 67 TEMP. L. REV. 575, 588 (1994). Those limited executive powers that did exist were vested in an elected Supreme Executive Council, which consisted of twelve members. *Id.* The document did not provide for an independent judiciary. Instead, judges were treated as "creatures of the political branches." *Id.*

In the ensuing decades, the citizens of Pennsylvania "became disillusioned with legislative supremacy" following many well-documented abuses of that power. GORMLEY ET AL., *supra*, at 471 (quoting ROSALIND L. BRANNING, A HISTORY OF PENNSYLVANIA CONSTITUTIONS, REFERENCE MANUAL NO. 3, at 5 (1968)). Throughout this era, the legislature all too often exceeded its constitutional authority, obstructed legitimate exercises of executive power, ignored judicial decisions, and disregarded individual liberties. *Id.* (citing Gordon S. Wood, *Foreword: State Constitution-Making in the American Revolution*, 24 RUTGERS L.J. 911, 922 (1993)). "By the mid-1780s, there was general agreement that 'many of the existing ills could be traced to an impotent judiciary,'"

and that Pennsylvania's constitutional system lacked essential safeguards on unchecked legislative power. *Id.* (quoting BRANNING, *supra*, at 4).

In 1789, a substantial majority of the legislature agreed that revisions to the Pennsylvania Constitution were necessary. The product of the ensuing convention—the Constitution of 1790—reflected a dramatic shift in the structure of our state government. Unlike its predecessor, this new Constitution vested executive power in a unitary executive with veto and appointment powers, PA. CONST. of 1790 art. II, created a bicameral legislature consisting of a house and senate, PA. CONST. of 1790 art. I, provided for an independent judiciary, PA. CONST. of 1790 art. V, and explicitly prohibited the legislature from infringing upon any of the individual rights enumerated in the Declaration of Rights. PA. CONST. of 1790 art. IX, § 26.

Given this historical context surrounding the introduction of the Remedies Clause in the Constitution of 1790, I am persuaded by the Yanakoses' argument that Article I, Section 11 should be understood to impose some outer limit on the General Assembly's power to enact legislation that curtails or eliminates a common law cause of action. *See Scarnati v. Wolf*, 173 A.3d 1110, 1118 (Pa. 2017) (explaining that, when interpreting a provision of the Pennsylvania Constitution, we should "consider the circumstances attending its formation and the construction probably placed upon it by the people"). While the precept that the Superior Court relied upon below—that "no one has a vested right in the continued existence of an immutable body of negligence law"[5]—is an accurate statement of the law, this Court has never held that the General Assembly possesses unlimited power to alter, limit, or abolish common law remedies. *See Ieropoli*, 842 A.2d at 925 (remarking that Article I, Section 11 is both an "imperative limitatio[n] on legislative

---

[5] *See Freezer Storage, Inc. v. Armstrong Cork Co.*, 382 A.2d 715, 720 (Pa. 1978) (internal quotation marks omitted).

authority" and an "imperative imposition[n] of judicial duty").[6] Indeed, the earliest decisions on the subject seemed to take for granted that the Remedies Clause to some extent restricts the General Assembly's authority to extinguish existing causes of action.

In *Central R.R. Co. of N.J. v. Cook*, 1 W. N. C. 319 (Pa. 1875), for example, the Court affirmed a decision striking down a statute that capped the maximum damages recoverable from a railroad corporation at $3,000. In declining to overturn that decision five years later, the Court explained that:

> we are not convinced that *[Central R.R. Co. of N.J.*] should be overruled. Its authority is in conservation of the reserved right to every man, that for an injury done him in his person, he shall have a remedy by due course of law. The people have withheld power from the legislature and the courts to deprive them of that remedy, or to circumscribe it so that a jury can only give a pitiful fraction of the damage sustained. Nothing less than the full amount of pecuniary damage which a man suffers from an injury to him in his lands, goods or person, fills the measure secured to him in the Declaration of Rights. . . . A limitation of recovery to a sum less than the actual damage, is palpably in conflict with the right to remedy by the due course of law.

*Thirteenth & Fifteenth St. Passenger Ry. v. Boudrou*, 92 Pa. 475, 481-82 (Pa. 1880).[7]

---

[6] In this regard, I observe that, in the medical malpractice context, some state courts have struck down laws that limit noneconomic damage awards and laws that require claims to be screened by medical experts before they can be filed in court. *Kentucky v. Claycomb*, 566 S.W.3d 202 (Ky. 2018) (invalidating a statute requiring submission of certain medical malpractice claims to a review panel before filing a civil action in court); *Lucas v. United States*, 757 S.W.2d 687 (Tex. 1988) (invalidating a $500,000 cap on non-economic damages in medical malpractice cases); *State ex rel. Cardinal Glennon Mem'l Hosp. for Children v. Gaertner*, 583 S.W.2d 107 (Mo. 1979) (invalidating a statute requiring submission of claims to a review board before filing a civil action in court). No such provision is before us today, and I express no opinion as to the constitutionality of any such measure.

[7] *Accord* THOMAS R. WHITE, COMMENTARIES ON THE CONSTITUTION OF PENNSYLVANIA 160 (1907) (explaining that the Remedies Clause "stands . . . as a barrier to any action by the Legislature tending to interfere with a man's right to sue and recover for an injury which he has suffered").

Together with the history of the Remedies Clause and this Court's precedent, the text and structure of the Constitution also support the conclusion that laws infringing the right to a remedy should be subject to some form of heightened judicial scrutiny. The preamble to Article I of the Constitution makes clear that the rights enumerated in the Declaration of Rights are "essential principles of liberty and free government" and must be protected from legislative encroachment. PA. CONST. art. 1, pmbl. Similarly, Article I, Section 25 reveals the framers' intent to prohibit all branches of government—including the legislature—from interfering with the exercise of the rights enumerated in the Declaration of Rights. PA. CONST. art. 1, § 25 ("To guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government and shall forever remain inviolate.").

For all of these reasons, I am willing to accept that laws which modify traditional common law remedies should be subject to some form of heightened judicial scrutiny.[8] I disagree, however, with the lead Opinion's conclusion that intermediate scrutiny should apply. Contrary to our precedent,[9] the lead Opinion's chosen standard "encroach[es]

---

[8]  *See* text accompanying n.11.  In arguing that "a heightened level of scrutiny" should apply to laws which alter or abolish traditional common law remedies, the Yanakoses contend that the lower courts erred in reviewing "the issues in this case under the rational basis test[.]"  Brief for the Yanakoses at 17-18.  The Yanakoses ask this Court instead to apply either intermediate or strict scrutiny, *id.* at 18-22, but they also cite approvingly to legal standards adopted by other state courts, which do not perfectly track the familiar due process standards of rational basis, intermediate scrutiny, and strict scrutiny.  *See id.* at 46-50 (discussing decisions from the Utah and Alabama supreme courts).

[9]  Unable to marshal any precedent to support today's holding applying intermediate scrutiny, the lead Opinion invokes J*ames v. Southeastern Pennsylvania Transportation Authority*, 477 A.2d 1302 (Pa. 1984) and *Smith v. City of Philadelphia*, 516 A.2d 306 (Pa. 1986), neither of which are Remedies Clause decisions.  Rather, *Smith* and *James* involved Fourteenth Amendment Equal Protection Clause challenges, which is why it is unsurprising that those Courts applied intermediate scrutiny.  To make matters worse, the lead Opinion fails to recognize that the portion of the *Smith* decision that applied "an intermediate standard of review" did not garner support from a majority of the Court.  In

upon the Legislature's ability to guide the development of the law" and "place[s] certain rules of the 'common law' and certain non-constitutional decisions of courts above all change except by constitutional amendment." *Freezer Storage*, 382 A.2d at 721. As this Court has cautioned in prior cases, "societal conditions occasionally require the law to change in a way that denies a plaintiff a cause of action available in an earlier day[.]" *Id.* at 720 (citing *Jackman v. Rosenbaum Co.*, 106 A. 238, 244 (Pa. 1919)). While it is not often that the legislature decides that a common law theory of recovery has outlived its useful life, neither is it unprecedented. *See, e.g.*, 23 Pa.C.S. § 1902 ("All causes of action for breach of contract to marry are abolished."); 23 Pa.C.S. § 1901 ("All civil causes of action for alienation of affections of husband or wife are abolished."). This Court itself has not hesitated to abrogate common law anachronisms. Consider, for example, the tort of criminal conversation—an action that could be brought against a third party who "engaged in at least a single act of sexual intercourse" with the plaintiff's spouse. *See Fadgen v. Lenkner*, 365 A.2d 147, 149 (Pa. 1976).

These concerns evince the principle that a legislature, like a court, may from time to time recognize that life and experience have consigned a common law rule to obsolescence, leaving that rule subject both to judicial modification and to statutory revision. Our own expressions throughout our Article I, Section 11 case law have, for at least a century, harmonized consistently with this perspective.[10] It follows that the

fact, Justice Flaherty's Equal Protection Clause analysis in *Smith* was joined only by a single justice, who himself wrote separately to clarify that "not all legislative restrictions which impact upon access to the courts" will require the application of intermediate scrutiny. *Smith* 516 A.2d at 312 (Nix, C.J., concurring). In other words, there is no support for the lead Opinion's holding that intermediate scrutiny applies for purposes of the Remedies Clause; indeed, our relevant decisions suggest quite the opposite. *See, e.g.*, *Freezer Storage*, 382 A.2d at 720 (upholding a twelve year statute of repose).

[10]    *See, e.g.*, *Carroll v. York Cty.*, 437 A.2d 394, 397 (Pa. 1981); *Freezer Storage*, 382 A.2d at 720; *Singer v. Sheppard*, 346 A.2d 897, 903 (Pa. 1975); *Jackman v. Rosenbaum Co.*, 106 A. 238, 244 (Pa. 1919).

intermediate scrutiny standard fails to afford the legislature sufficient latitude to modify traditional common law remedies. In other words, today's decision impedes and flouts the General Assembly's policymaking authority, thus countenancing the very "stagnation of the law in the face of changing societal conditions" that this Court has warned our Constitution does not mandate. *Freezer Storage*, 382 A.2d at 720 (quoting *Singer v. Sheppard*, 346 A.2d 897, 903 (Pa. 1975)). Rather than embrace a test that is manifestly incompatible with our existing Remedies Clause jurisprudence, I would follow the lead of the many courts which have held that the legislature may abrogate or modify a common law cause of action in response to a clear social or economic need, so long as the challenged legislation bears a rational and non-arbitrary connection to that need.[11] This standard strikes the appropriate balance between the two primary concerns expressed in our prior cases: (1) guarding the constitutional right to a remedy; and (2) affording the people's representatives necessary and proper latitude to shape public policy.

Applying this standard, I would conclude that the General Assembly's imposition of a seven-year statue of repose on most medical malpractice claims bears a rational and non-arbitrary connection to a clear economic need. As an initial matter, the Yanakoses appear to concede the economic need for the MCARE Act's reforms. The Yanakoses do not dispute that the General Assembly imposed the seven-year statute of repose to

---

[11] *See, e.g., Robinson v. Charleston Area Med. Ctr., Inc.*, 414 S.E.2d 877, 884 (W.Va. 1991) (explaining that legislation implicating the Remedies Clause of the West Virginia Constitution will be upheld if "the purpose of the alteration or repeal of the existing cause of action or remedy is to eliminate or curtail a clear social or economic problem, and the alteration or repeal of the existing cause of action or remedy is a reasonable method of achieving such purpose"); *Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 680-81 (Utah 1985) (explaining that abrogation of a remedy or cause of action is constitutionally justified if "there is a clear social or economic evil to be eliminated and the elimination of an existing legal remedy is not an arbitrary or unreasonable means for achieving the objective"); *Lankford v. Sullivan, Long & Hagerty*, 416 So.2d 996, 1000 (Ala. 1982) (holding that legislation which abolishes or alters a common law cause of action is unconstitutional unless it "eradicates or ameliorates a perceived social evil").

preclude the filing of aged lawsuits, which increase the cost of medical professional liability insurance in the Commonwealth, which, in turn, increases the overall cost of health care services. *See* Brief for the Yanakoses at 25; *see also* 40 P.S. § 1303.102(3) ("To maintain [a comprehensive and high-quality health care] system, medical professional liability insurance has to be obtainable at an affordable and reasonable cost in every geographic region of this Commonwealth."). Thus, there can be no real dispute that the General Assembly has an important interest in ensuring both that Pennsylvania physicians have access to affordable malpractice insurance and that Pennsylvania citizens have access to affordable medical care. Nor could anyone dispute that there is a "clear social or economic need" for an affordable and well-regulated health care system.

Rather than challenge the economic necessity of the MCARE Act, the Yanakoses argue that the statute of repose is unconstitutional because it creates arbitrary distinctions between classes of medical malpractice victims. In this regard, the Yanakoses stress that the statute of repose does not apply to injuries caused by a foreign object that has been negligently left inside a patient's body. *See* 40 P.S. § 1303.513(b). According to the Yanakoses, this exception to the statute of repose "arbitrarily protects the right of certain victims of malpractice to seek a remedy while closing the courthouse doors to other victims who are similarly situated." Brief for the Yanakoses at 28.

The foreign-object exception to the statute of repose does not render the statute arbitrary or irrational. There are persuasive and wholly non-arbitrary reasons for the MCARE Act's unique treatment of foreign object cases. First, cases that fall within the foreign-object exception are almost certainly rare. *See Fessenden v. Robert Packer Hosp.*, 97 A.3d 1225, 1233 (Pa. Super. 2014) (noting that "sponge left behind" cases are uncommon in Pennsylvania). Second, it is conceivable that a foreign object concealed in a patient's body would be more likely than other manifestations of medical negligence to

go unnoticed for many years. Finally, foreign object cases, unlike other cases of medical negligence, generally will not involve difficult problems of proof, since the discovery of the foreign object is itself compelling evidence of some earlier negligent act. *See Toogood v. Owen J. Rogal, D.D.S., P.C.*, 824 A.2d 1140, 1147 (Pa. 2003) (discussing the application of *res ipsa loquitur* in "'sponge left in the patient' cases"). This means that, while the mere passage of time can make non-foreign object cases difficult (and expensive) to defend against, foreign object cases are less likely to be compromised by changing standards of care, waning memories of witnesses, or the unavailability of relevant documents. Given these significant differences, the General Assembly's decision to exempt foreign object cases from the statute of repose was neither arbitrary nor irrational.[12]

Furthermore, even if I agreed with the lead Opinion's invocation of intermediate scrutiny, I would still uphold the MCARE Act's statute of repose. As the lead Opinion explains, to pass intermediate scrutiny, the law in question must be substantially related to an important governmental objective. Lead Opinion at 12; *see United States v. Virginia*, 518 U.S. 515, 533 (1996). As explained above, the Yanakoses do not dispute (nor could they, really) that ensuring access to affordable liability insurance for medical professionals, thus ensuring access to affordable medical services for patients, is an important governmental objective. The only question, then, is whether the MCARE Act's statute of repose is substantially related to the objective of reducing the cost of medical

---

[12] The exception to the statute of repose for malpractice claims brought by or on behalf of minors, 40 P.S. § 1303.513(c), is similarly a rational and non-arbitrary means to address a clear social and economic predicament. The General Assembly undoubtedly recognized that minors, who cannot assert medical negligence claims on their own behalf, should be given a fair opportunity to bring their claims after reaching the age of majority. Indeed, the Yanakoses acknowledge that this exception is "narrowly tailored," and that its "application fully encompasses its purpose." Brief for the Yanakoses at 29.

professional liability insurance.  It is.  One need not be an expert in the economics of the insurance industry to understand that the cost of insurance coverage corresponds generally with the insurer's own costs, which will decrease when fewer aged claims are filed.[13]  Because the statute of repose advances the underlying objective of reducing the cost of malpractice insurance, it withstands intermediate scrutiny.

In support of its holding, the lead Opinion advances a novel suggestion: to wit, that the intermediate scrutiny standard requires "evidence in the legislative history" explaining "how the General Assembly arrived at a seven-year statute of repose with exceptions for foreign objects cases and minors."  Lead Opinion at 18.  This is startling.  With this test in hand, lawyers are now charged with the duty of mining house and senate journals and committee reports in an effort to satisfy judges that lawmakers have been, in effect, 'reasonable enough.'  The lead Opinion's new legislative-history-inspection-standard resembles a homework assignment for the General Assembly, an assignment this Court is not authorized to give.  As a matter of law, the General Assembly need not "cite . . . statistics" (*see id.*) so as to anticipate and satisfy a prospective reviewing court that a shorter statute of repose would have been inadequate to achieve the legislature's goal of reducing medical malpractice insurance premiums.  Citation of supporting statistics on the house or senate floor is not a judicial approval checklist item to be prescribed by this

---

[13]  *See generally* U.S. Gen. Accounting Office, *Medical Malpractice Insurance: Multiple Factors Have Contributed to Increased Premium Rates*, 16 (June 2003), *available at* https://www.gao.gov/new.items/d03702.pdf ("Incurred losses are the largest component of medical malpractice insurers' costs.  For the 15 largest medical malpractice insurers in 2001—whose combined market share nationally was approximately 64.3 percent—incurred losses (including both payments to plaintiffs to resolve claims and the costs associated with defending claims) comprised, on average, around 78 percent of the insurers' total expenses.  Because insurers base their premium rates on their expected costs, their anticipated losses will therefore be the primary determinant of premium rates.").

or any other court.  This is an exacting, even imperial, standard that ignores the manner in which judicial review works.

In essence, the lead Opinion concludes that the seven-year statute of repose is both overinclusive (because a longer repose period might have reduced medical malpractice insurance premiums just as well as a shorter one) and underinclusive (because minors and foreign-objects plaintiffs are exempt from the statute of repose).  *Id.* at 18-19.  But the intermediate scrutiny inquiry that the lead Opinion itself adopts does not require that the General Assembly choose the least restrictive means available to achieve its objective.  *See Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311 (2013) (discussing the narrow tailoring requirement associated with strict scrutiny).  Intermediate scrutiny requires only a substantial relation between a legislature's goal and the means that it selected to achieve that goal.  Whether a different law also might have achieved the legislature's goal is not a question for this Court.  The standard of scrutiny that the lead Opinion adopts is intermediate in name only.  In substance, today's decision simply invites judges to substitute their own public policy views in the place of arguably imperfect, but duly enacted, legislation.  Nothing in the text or history of Article I, Section 11 sanctions this judicial second-guessing of the General Assembly's policy decisions.  There is of course no end to such a court-as-supervisor enterprise.

In sum, I would hold that statutes which modify or abolish common law causes of action violate Article I, Section 11 of the Pennsylvania Constitution unless the challenged legislation is supported by a clear social or economic need for reform.  If a law is not supported by such a need, or if the means chosen to address the social or economic problem are arbitrary or irrational, then the law is unconstitutional.  Because I would find that the MCARE Act's statute of repose satisfies this benchmark, I would affirm the decision of the Superior Court.

Chief Justice Saylor and Justice Baer join this dissenting opinion.